**Michael Dewayne STEARNES, Relator,**

v.

**Hon. Thomas L. CLINTON, Respondent.**

**No. 70848.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 27, 1989.

---

**2.** Tex.R.App.Pro. 83 applies to defects in notice of appeal but does not apply when no notice of appeal is ever given.

David L. Botsford, Austin, Ralph H. Brock, Lubbock, for relator.

Thomas L. Clinton, Lubbock, pro se.

Travis S. Ware, Dist. Atty., Lubbock, for real party in interest.

Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON ORIGINAL APPLICATION FOR WRIT OF MANDAMUS AND ORIGINAL APPLICATION FOR WRIT OF PROHIBITION

W.C. DAVIS, Judge.

This original action has been filed by a capital murder defendant in Lubbock County. Leave to file was granted with respect to relator's allegation number one. In this allegation relator Stearnes seeks to have this Court issue a writ of mandamus directing the trial court to vacate an order removing relator's court appointed counsel from the case. Leave to file was denied with respect to relator's allegation number two in which he sought a writ of mandamus to compel the trial court to set the instant case for trial, or, in the alternative, a writ of prohibition to prevent the trial court from permitting further unjustified delays in setting the case for trial. We will address only relator's allegation number one. We will grant relief on this allegation. A brief recitation of the facts is necessary.

The scenario which preceded and precipitated the filing of relator's motion for leave to file this writ of mandamus began after he was indicted for capital murder in Lubbock County on October 6, 1987. Judge Thomas L. Clinton, District Judge for the 99th Judicial Court of Lubbock County, appointed attorney Carlton McLarty to represent relator (also hereinafter referred to as "Stearnes") in that matter. Stearnes is one of four co-defendants charged with a capital murder and Anita Hanson is one of the State's key witnesses. Hanson was initially placed in protective custody by the Lubbock County District Attorney's Office. Later, Hanson was released from protective custody and for a brief period of time resided with Assistant District Attorney Marta Rosas, who was responsible for the pretrial matters in the prosecution of Stearnes.

The apparent policy of the Lubbock County District Attorney's Office is that defense counsel needs permission of that office before he can interview a witness. In an attempt to comply with the local policy, McLarty wrote a letter to Rosas asking for her cooperation in arranging an interview with Hanson. The record indicates that Rosas did not respond to the letter and no steps were taken by the District Attorney's Office to arrange the requested interview.

Sometime after his written request to interview Hanson was ignored by the Dis-

trict Attorney's Office, McLarty received a phone call from Hanson, who posing as someone else, asked for advice on how she could find if there were any charges pending against her. Recognizing the caller as Hanson, McLarty told her and her roommate that he could not undertake representation of Hanson in any manner and told her that Hanson should get a lawyer.

In a later telephone conversation, Hanson agreed to talk with McLarty. They agreed to a time and place for an interview concerning the facts and circumstances of Stearnes's involvement in the capital murder. The interview was scheduled for 7:15 p.m. at Hanson's home. McLarty arrived timely at Hanson's apartment in the company of another attorney from his office and two other people to function as witnesses to the questioning, which was to be tape recorded. Shortly thereafter Anderson (Hanson's roommate) arrived and was present throughout the interview. Sometime during the interview and after Hanson had responded to many questions concerning various aspects of the case, Hanson called Assistant District Attorney Rosas. After her conversation with Rosas, Hanson stated that she would not continue the interview until Rosas arrived. Rosas called the police and reported that there was a civil disturbance in progress at the apartment Hanson shared with Anderson. When Rosas arrived at the apartment the police had already arrived. Rosas entered the apartment and announced to McLarty and his colleagues, "gentlemen, this interview is over."

In light of the fact McLarty failed to complete his interview with Hanson, he thereafter filed a motion to depose Hanson pursuant to Article 39.02, V.A.C.C.P. The trial court ordered a hearing on the motion. At the hearing, in addition to contesting the motion to take Hanson's deposition, District Attorney Travis Ware orally sought to have McLarty removed from the case on the basis that counsel could potentially be a witness because he had interviewed Hanson. The trial court did not rule on the relator's motion to depose Hanson. However, despite the attorney's and relator's objections, he granted the oral motion of the District Attorney to remove McLarty from the case and in doing so the trial court stated:

The Court: The testimony that I have heard here today has caused me to have considerable problems with this case.

I don't think there is any question in the mind of either side but what Anita Hanson has been a protected witness for some period of time after threats have been made on her life and attempts. And I am not concerned with the fact that the city has spent several hundred thousand dollars attempting to protect her, because apparently it was justified, but it concerns me greatly when attorneys, who know better, would take it upon themselves to go out at that time of night and talk to a witness, and leave themselves wide open to—she could have come in and said "They attempted to bribe me," and you wouldn't have had anything except the person you took with you as your witness, to refute it.

That didn't happen, fortunately.

I don't know what went on out there, whether there was tampering, attempted tampering with a witness, or whether it was harassment of a witness, or just what it was, but it concerns me very much.

And based upon all of the testimony I have heard since 10:00 o'clock this morning, it is now 3:00 o'clock in the afternoon, and the manner in which the attorneys went about doing this, and taking statements, getting the witness to sign, things of that nature, and coupled with the fact that there have been numerous times in which defense counsel has had the opportunity, and made use of the opportunity to cross examine this witness, and I don't say it is the State's witness, "witness" is a generic term more than anything else; that witness doesn't any more belong to the State than it does to the defense; but at any rate there was a right and wrong way to go about this, and in view of all of the evidence that I have heard today, and the accusations that have been made on the part of the defense toward the State of

obstructing justice, obstructing this, that, and the other, it is the conclusion of the Court that the one that loses on this is the defendant.

It is the conclusion also of the Court that, Mr. McLarty, you have compromised your ability to furnish this defendant a reasonable and effective representation as an attorney, and I am going to—since I did appoint you, I am going to rescind that appointment, and also of Mr. Lanehart, and in due time, the Court will appoint another attorney to represent the defendant, and one perhaps with more experience and—at any rate, it will not be necessary for the Court at this time to rule on the question of whether a deposition should be taken, or not.

During a hearing the next day, in which the trial court appointed another attorney, Floyd Holder, to represent Stearnes, Judge Clinton added:

It is the opinion of the court that Mr. McLarty was not competent to continue on this, and he has so antagonized the District Attorney's Office that he can't get any cooperation from them in any shape, form or fashion.

It is interesting to note that Holder had been contacted three days before the hearing by Judge Clinton about his ability to serve as Stearnes's appointed council.

As a result of the aforementioned, Stearnes now claims that he is entitled to a writ of mandamus to compel Judge Clinton to vacate his order removing McLarty and co-counsel Lanehart from the case. We agree.

Historically, this Court has stated that to be entitled to the extraordinary relief of mandamus, the relator must establish two essential requirements: (1) that the act sought to be compelled is purely ministerial, as opposed to discretionary or judicial in nature, and (2) no other adequate remedy at law is available. *State ex rel. Curry v. Gray,* 726 S.W.2d 125 (Tex.Cr.App.1987).

Relative to the first consideration, this Court has emphasized that the essential question in deciding if the act is ministerial "is whether the respondent had the authority ...," *State ex rel. Thomas v. Banner,*

724 S.W.2d 81, 83 (Tex.Cr.App.1987), to do what is the subject of the complaint. In *Thomas,* supra, a district judge granted a defendant shock probation on four convictions. The district attorney contested his statutory authority to do so and requested mandamus relief. Reviewing the sequence of the convictions and sentences and contrasting that with the relevant statute, a unanimous Court essentially said that the statute did not vest the trial judge with the authority to grant the defendant shock probation; consequently, it was his ministerial duty to vacate the orders." *Id.* After the Court found that the State did not have an adequate remedy at law, it conditionally granted mandamus relief.

Similarly, in *State ex rel. Vance v. Hatten,* 600 S.W.2d 828 (Tex.Cr.App.1980), the Court again examined a situation in which the trial judge granted a defendant shock probation. The defendant had been found guilty of involuntary manslaughter and assessed ten years in the Texas Department of Corrections. Within the authorized time period the trial court granted the defendant shock probation. In its request for mandamus relief, the State claimed the judge did not have the authority to grant the defendant shock probation because the applicable statute (Article 42.12, § 3e[a], V.A.C.C.P. [amended 1986]) excludes from his otherwise pervasive authority to grant shock probation certain types of cases including criminal homicide.

The Court initially concluded that involuntary manslaughter is a form of criminal homicide. The unanimous Court tentatively stated: "it appears that the trial court exceeded the scope of its authority in granting Norris [defendant] this 'shock probation.' As we have previously stated in *State ex rel. Wilson v. Harris,* 555 S.W.2d 470 (Tex.Cr.App.1977), mandamus is the proper relief to set aside an improper order." *Id.,* at 830.

After examining the parties' respective positions, the majority, conditionally granting mandamus relief, became more conclusive and wrote:

Thus, we conclude that, according to the clear and unambiguous language of

the statute, the respondent was *without authority* to grant 'shock probation' pursuant to Article 42.12, Sec. 3e, to defendant Norris, convicted of criminal homicide. Accordingly, such order is void. We assume that respondent will immediately perform his duty to withdraw such void order. The writ of mandamus will issue only if he refuses to do so [emphasis added].

*Id.,* at 831.

The conclusions reached by the Court in *Thomas* and *Vance,* both supra, make it quite clear, as Judge Miller wrote in *Thomas,* supra, "[i]f he did not have the authority it was his ministerial duty to vacate the orders." *State ex rel. Thomas v. Banner,* 724 S.W.2d at 83. *Accord: Kopeski v. Martin,* 629 S.W.2d 743 (Tex.Cr.App.1982).

In the case at bar, neither the named parties, nor the State, nor the amicus curiae claim that Judge Clinton was acting pursuant to any statutory authority. Thus, unless Judge Clinton's act can be supported in some other manner, then this Court's decisions in the *Thomas* and *Vance* cases are stare decisis and the first prerequisite for relief is satisfied.

A case remarkably similar to this case is *Smith v. Superior Court of Los Angeles County,* 68 Cal.2d 547, 68 Cal.Rptr. 1, 440 P.2d 65 (1968). In that case, a capital murder prosecution, a California Superior Court Judge removed appointed trial counsel over the defendant's vigorous and continual objections because counsel's courtroom demeanor had fallen short of customary standards in several instances. Because of counsel's conduct the trial judge concluded that counsel was "incompetent" to handle a capital trial. Although the California Supreme Court did not condone the intemperate behavior of counsel, it confronted and resolved the issue of whether the trial judge possessed the inherent power to make such an order over the objections of the defendant and his attorney. In reaching its conclusion the court stated:

All will agree that if the defendant's attorney exhibits objective evidence of *physical incapacity* to proceed with a meaningful defense of his client, such as

illness, intoxication, or a nervous breakdown [citations omitted], the court need not sit idly by; it should inquire into the matter on its own motion, and if necessary relieve the affected counsel and order a substitution. Yet even that action should be taken with great circumspection and only after all reasonable alternatives, such as granting of a continuance, have been exhausted. Failure to observe these standards, although in a case of undisputed physical incapacity of counsel, will compel a reversal of the ensuing judgment; and this result will follow regardless of whether the defendant's substituted counsel was competent or whether the defendant received a 'fair trial' with respect to the guilt-determining process. (*People v. Crovedi* [1966] 65 Cal.2d 199, 53 Cal.Rptr. 284, 417 P.2d 868.) The value in issue, we said in *Crovedi,* is 'the state's duty to refrain from unreasonable interference with the individual's desire to defend himself in whatever manner he deems best, using every legitimate resource at his command.' [citations omitted]

*Id.,* 68 Cal.Rptr. at 9, 440 P.2d at 72.

The court then concluded that a trial court did not have the inherent power to remove trial counsel because in his subjective opinion counsel was incompetent. The California Supreme Court believed that to invest a trial judge with such authority would constitute a severe threat to the independence of the defense bar. Such inherent power, according to the Supreme Court, could lead to an arbitrary misuse of authority and compromise the adversary process. Quoting from defense counsel's brief, the court stated:

If the advocate must labor under threat that, at any moment, if his argument or advocacy should incur the displeasure or lack of immediate comprehension by the trial judge, he may be summarily relieved as counsel on a subjective charge of incompetency by the very trial judge he is attempting to convince, his advocacy must of necessity be most guarded and lose much of its force and effect.

*Id.,* 68 Cal.Rptr. at 10, 440 P.2d at 74.

Disposing of the case, the court granted Smith the extraordinary relief he request-

ed, and ordered trial counsel's reinstatement. This is essentially the same relief the relator is requesting.

In his response to the relator's application, Judge Clinton argues that the facts in the *Smith* case distinguish it from this case. In *Smith,* supra, the attorney who was removed from the case had represented Smith in a previous appeal of the same case and was intimately familiar with the record of the previous trial. Objectively reading the opinion, it is apparent that the attorney's experience with the case did not dictate the result; nor should it in this case. One should note that Judge Clinton's written order appointing McLarty is dated November 13, 1987. The order appointing Lanehart is dated June 24, 1988; so, McLarty has been representing Stearnes for over one and a half years and Lanehart for almost one year. Contrary to Judge Clinton's position, the experience of the respective attorneys make the *Smith* case even more parallel to the present case.

*Smith v. Superior Court of Los Angeles,* supra, was followed ten years later by *Harling v. United States,* 387 A.2d 1101 (D.C.Cir.1978), with basically the same resolution of the issue, that is, with certain exceptions inapplicable to this case, a trial judge does *not* have the inherent power to remove defense counsel. The defendant in the *Harling* case was charged with first degree murder while armed and carrying a pistol. After being indicted, an attorney was appointed to represent him. At a pretrial hearing, the defendant's attorney, responding to the trial court's summarily denying his motion for discovery, commented that such a ruling would render him ineffective. Without allowing counsel to adequately explain his comment, the trial court rescinded his appointment and stated it would appoint the defendant another attorney. Shortly thereafter, the defendant expressed his objections to the court discharging his attorney.

Another attorney was appointed to represent the defendant. The defendant was convicted. His principal complaint on appeal was that the trial judge had no authority to remove his appointed attorney from

the case. The District of Columbia Court of Appeals unanimously agreed.

In a preliminary comment that is somewhat reflective of the present case, the court stated: "[T]here appears no 'just' justification for the order withdrawing ... [the attorney] ... the only justification for the Court's actions is counsel's determination to effectively represent the defendant." *Id.,* at 1102. Lending credence to this comment, the court observed that the trial court had written on his order discharging counsel this statement: " 'Denied The Court is paying for counsel, not the deft [sic].' " *Id.* Although not identical, this notation is all too similar to Judge Clinton's comment when removing McLarty: "[S]ince I did appoint you, I am going to rescind that appointment, and also of Mr. Lanehart...."

The *Harling court* identified the ultimate issue similar to the way the California Supreme Court did in the *Smith* case. The *Harling* court stated the issue as follows: "We are called upon to decide in this case whether a trial judge may discharge court-appointed counsel, over the objection of the attorney and the defendant and under circumstances when the removal of retained counsel would not be justified." *Id.*

In resolving this issue the court noted that an indigent defendant does not have the right to the appointment of a particular attorney. This is the law in Texas. *Malcom v. State,* 628 S.W.2d 790 (Tex.Cr.App. 1982). However, the court also noted "that once an attorney is serving under a valid appointment by the court and an attorney-client relationship has been established, the court may not arbitrarily remove the attorney over the objections of both the defendant and his counsel." *Harling v. United States,* 387 A.2d at 1102. This should be the law in Texas.

In essence, what the *Harling* court held is that an accused with adequate funds has a right to secure counsel of his own choice. If, however, the defendant is indigent he must be appointed counsel. *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Once counsel has been validly appointed to represent an indigent

defendant and the parties enter into an attorney-client relationship it is no less inviolate than if counsel is retained.

In *Ex parte Prejean*, 625 S.W.2d 731 (Tex.Cr.App.1981), this Court confronted the opposite of the present issue. In *Prejean*, supra, the defendant was indicted for capital murder and was appointed an attorney. Later, the defendant retained different counsel. The trial judge disqualified the retained attorney from representing the defendant because the attorney had a conflict of interest. The defendant expressly waived the conflict. He then brought a mandamus proceeding requesting this Court to order the trial judge to vacate his order disqualifying the retained attorney.

The Court initially stated the fundamental principle that under both the Federal and State Constitutions and the Texas Code of Criminal Procedure an accused in a criminal proceeding is entitled to the assistance of counsel. The opinion then noted that "[t]his, of course, includes freedom of choice in the selection of counsel by the accused." *Id.*, at 733.

The Court concluded that because the defendant had waived the potential conflict of interest, "the record does not affirmatively reflect a justifiable legal reason for the trial court to disqualify ...," *id.*, the retained attorney. Accordingly, it concluded that mandamus relief was the proper remedy, but withheld issuing the writ on the assumption that the trial judge would vacate his order.

■ The Court's decision that the retained attorney's potential conflict of interest did not disqualify him from representing the defendant may be of questionable validity, at least under federal law, because of *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988) (see discussion, *infra*, p. 223). Nevertheless, the basis of the opinion is still sound: a defendant has the right to retain counsel of his choice and establish an attorney-client relationship. It logically follows, as the *Harling* court noted, that once an attorney is appointed the same attorney-client relationship is established and it should be pro-

tected. Any effort to distinguish between the two will be premised upon a fallacy because the "attorney's responsibility is to the person he has undertaken to represent rather than to the individual or agency which pays for the service." *Smith v. Superior Court of Los Angeles*, 68 Cal. Rptr. at 10, 440 P.2d at 74.

More recently, in *In re Civ. Contempt Proc. Concerning Richard*, 373 N.W.2d 429 (S.D.1985), and *Matter of Welfare of M.R.S.*, 400 N.W.2d 147 (Minn.App.1987), the South Dakota Supreme Court and a Minnesota Court of Appeals continued the precedence by rejecting the idea that a trial court had some inherent power to arbitrarily discharge a criminal defendant's appointed counsel. In the *Richard* case the court, quoting *Harling*, supra, held that a trial court did not have the power to discharge an attorney appointed to represent a grand jury witness who had been held in contempt after rejecting an offer of immunity. The trial court apparently had concluded that counsel's advice to the witness was impeding a grand jury investigation. Accordingly, the Supreme Court granted extraordinary relief and set aside the trial court's order discharging the witness's attorney.

In the *M.R.S.* case, the Minnesota Court of Appeals confronted the order of a trial judge discharging a juvenile's appointed counsel. Quoting *Smith* and *Harling*, both supra, the Court of Appeals found the removal of the juvenile's attorney unacceptable and stated:

> An inviolate attorney-client relationship has been created and should not be arbitrarily disturbed. The fact that the county was paying for counsel does not in and of itself provide the trial court with sufficient justification for arbitrary removal of Klein [appointed attorney] over the objections of M.R.S. and Klein.

*Matter of Welfare of M.R.S.*, 400 N.W.2d at 150.

■ Counsel should not have to serve two masters. An attorney's loyalty is to his client and he should feel free to function within the bounds of the law and ethical propriety for his client. The previously

cited authorities make it clear that the power of the trial court to appoint counsel to represent indigent defendants does not carry with it the concomitant power to remove counsel at his discretionary whim. As noted, to hold otherwise would be to discriminate between retained and appointed counsel without a semblance of rationality.

Last term, the United States Supreme Court dealt with a situation that invokes shades of the latter concern. In Wheat v. United States, supra, a defendant in a complex drug prosecution, requested the trial court's permission to substitute as counsel another lawyer he wanted to hire. The trial court denied the defendant's request observing that his request had come two days before trial and that the lawyer the defendant wanted to hire had "an irreconcilable conflict of interest ..." 108 S.Ct. at 1696, because he had represented other defendants in the same prosecution. The defendant was convicted. The Court of Appeals affirmed the defendant's conviction and decided that the district court had the right to deny the substitution of counsel.

Before the Supreme Court the defendant argued that he had waived the conflict of interest issue and that should have cured the difficulty. The Supreme Court responded that notwithstanding the waiver, "Federal courts have an independent interest in ensuring criminal trials are conducted within the ethical standards of the profession...." *Id.* It then cited a number of Rules of Professional Conduct that impose limitations on one attorney representing multiple defendants. Because of this, according to the Court, Rule 44(c) Fed.R. Crim.Pro., requires the trial judge to specially investigate cases of joint representation and implicitly order that defendants be separately represented.

The Supreme Court concluded that a trial court can decline an offer of waiver of conflict of interest and, without violating a defendant's Sixth Amendment rights, "insist that defendants be separately represented." *Id.*

What is important and relevant in the *Wheat* case is this observation: "The Dis-

trict Court must recognize a presumption in favor of petitioner's counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Id.* The Supreme Court has held, consistent with *Smith,* supra, *Harling,* supra, and *Prejean,* supra, that a presumption exists that a defendant is entitled to counsel of his choice and a trial court cannot infringe upon one's constitutional right to counsel unless there is an actual or serious potential for conflict.

Such an exception is not applicable to the present case. Once McLarty and Lanehart were court appointed they became and remain the relator's attorneys. *Ward v. State,* 740 S.W.2d 794 (Tex.Cr.App.1987); *Axel v. State,* 757 S.W.2d 369 (Tex.Cr.App. 1988). Even though they were not retained by the relator, under *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), that is irrelevant. The attorneys were the relator's "counsel of choice...." *Wheat v. United States,* 108 S.Ct. at 1697; *Harling v. United States,* supra.

■ It is as obvious in this case as it was to the appellate courts in the *Smith, Harling, Richard,* and *M.R.S.* cases that the trial court did not have the inherent power to validly remove appointed counsel and doing so patently violated the relator's right to counsel. Since Judge Clinton did not have such inherent power he acted without authority. Accordingly, under *State ex rel. Thomas v. Banner,* and *State ex rel. Vance v. Hatten,* both supra, the relator has satisfied the first prerequisite for mandamus relief.

■ Before discussing whether the relator has an adequate remedy at law, it is appropriate to observe that although the previously cited cases are of unquestionable precedential value, the present case is somewhat different in that it reveals a more serious misuse of judicial power than the cases previously cited. Here the trial court chose not to remove trial counsel for his incompetence but for his competence. Although the trial court called into question McLarty's competence, and the fact that he may have exposed himself to being

a witness, in reality it is obvious that he was angered over trial counsel's action in interviewing a State's witness in violation of the District Attorney's rule. At best, such a local "rule" is tenuous and in actuality is a legal nullity. *See:* ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and Defense Function § 3.1 (Approved Draft 1971). The rule in question is not only in conflict with principles of fair play, but in direct conflict with defense counsel's responsibility to seek out and interview potential witnesses. The American Bar Association Project on Standards for Criminal Justice expressly charges defense counsel to do what McLarty did in this case.

> Unless the lawyer for the accused is prepared to forego impeachment of a witness by the lawyer's own testimony as to what the witness stated in an interview or to seek leave to withdraw from the case in order to present his impeaching testimony, the lawyer should avoid interviewing a prospective witness except in the presence of a third person.

ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and Defense Function § 4.3(d) (Approved Draft 1971). *See also:* Bailey and Rothblath, Successful Techniques for Criminal Trials (2nd ed.1985) § 11.10; Arnolds, et al, Eyewitness Testimony: Strategies and Tactics (1984).

In addition, Judge Clinton's condemnation of McLarty is rejected by case law. In *Ex parte Duffy*, 607 S.W.2d 507 (Tex.Cr. App.1980), this Court held that defense counsel has an obligation to make an independent investigation of the facts of the case. Further, "A corollary of this notion is that counsel also has a responsibility to seek out and interview potential witnesses ... [citations omitted] and failure to do so is to be ineffective, if not incompetent, where the consequence is that the only viable defense available to the accused is not advanced." Id., at 517. *See also: Davis v. Alabama,* 596 F.2d 1214 (5th cir. 1979); *Harris v. Estelle,* 487 F.2d 1293 (5th cir.1974); *Williams v. Beto,* 354 F.2d 698 (5th cir.1965).

Recently, in *Sullivan v. Fairman,* 819 F.2d 1382 (7th cir.1987), the Court of Appeals held that the failure of defendant's attorney to locate and interview witnesses identified in police reports fell below the minimum standard of performance expected of defense counsel as set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Moreover, under the facts of the case counsel's deficient performance was of such a magnitude that the almost unreachable second step in *Strickland,* supra, was surpassed. The defendant was consequently given a new trial.

Contrasting the analysis used in both *Duffy* and *Sullivan v. Fairman,* supra, with Judge Clinton's comments about McLarty interviewing Hanson, it is fair to say that McLarty was "between a rock and a hard place." Judge Clinton, after unfairly condemning his conduct, removed McLarty because he interviewed a witness. On the other hand, McLarty could have been deemed incompetent if he did not interview her. As a result of this dichotomy, McLarty's effectiveness was rendered impotent.

In removing McLarty, Judge Clinton made other comments that were both illogical and unreasoned. First, the interview with Hanson began at 7:15 p.m. and was terminated at 9:00 p.m. According to Judge Clinton, this is too late to work. This finding is insupportable. Second, it is tenuous to claim that attorneys merely talking to a witness "leave themselves wide open to ..." allegations of impropriety. If merely talking with a witness produces a disqualification because there is a mere possibility that claims of misconduct could be made, then all investigators, prosecutors, and defense lawyers will invariably be subject to being removed. That simply and understandably is not the law.

■ The judge also suggests that McLarty may have engaged in unlawful conduct while interviewing Hanson. If that occurred McLarty should be prosecuted under the appropriate penal code provision. On the other hand, Judge Clinton's apparently unfounded speculation cannot

be deemed as a valid basis for counsel's removal.[1]

■ For this Court to acquiesce and condone such judicial behavior will surely encourage similar behavior and substantially encroaches on the honest good-faith efforts of appointed counsel to represent their client and present their cause, thereby putting the independence of the bar into jeopardy. Under the circumstances of this case, the trial court, having no power or authority to remove McLarty and Lanehart as Stearnes's counsel, properly invokes our mandamus jurisdiction if relator does not have an adequate remedy at law.

Stearnes concedes that in the event this Court denies relief via the issuance of the writ of mandamus, he ultimately will be able to seek review on this issue through an appeal if a conviction results from a trial on the merits. Notwithstanding the fact an appeal may be available in the event of a conviction, it is asserted that appeal in this instance is not an adequate remedy. Again, we agree. In *Smith v. Flack*, 728 S.W.2d 784 (Tex.Cr.App.1987), this Court addressed the substance the term "adequate remedy at law" and stated:

A writ of mandamus is an extraordinary remedy that compels a respondent to perform some ministerial act. Often involved are sensitive questions concerning an elected official's authority to perform a particular duty. To assure that a relator will not prematurely apply for extraordinary relief via writ of mandamus, this Court, consistent with the Supreme Court, requires that a relator show that he has no other *adequate* remedy at law before mandamus will issue.

In some cases, a remedy at law may technically exist; however, it may nevertheless be so uncertain, tedious, burdensome, slow, inconvenient, inappropriate or ineffective as to be deemed inadequate. See, e.g., *Houston v. T.C. Ry. Co. v. City of Dallas*, 98 Tex. 396, 84 S.W. 648, 656 (1905) ('there is not a plain, adequate, certain, and speedy remedy'); *City of Highland Park v. Dallas Ry. Co.*, 243 S.W. 674, 681 (Tex.Civ.App.— Dallas 1922, writ ref'd) (remedy must be 'equally convenient, beneficial, and effective as the proceeding by mandamus'). *Id.*, at 792.

■ The remedy of appeal is simply inappropriate to the situation present here. While we acknowledge that an indigent defendant has no right under the Federal or State Constitutions to have counsel of his choosing, the right-to-counsel provisions of the respective constitutions prevents the trial court from unreasonably interfering with the counsel duly appointed. Once a valid appointment has been made, the trial court cannot arbitrarily remove him as attorney of record over the objections of the defendant and counsel. Having appointed counsel, a criminal defendant should not be subjected to a trial and appeal process without the appointed counsel he had grown to accept and gain confidence in. The utilization of the appellate process in this situation to correct this particular ill would be too burdensome and would only aggravate the harm and most likely would result in a new trial compelling relator to again endure a trip through the system,[2] creating in turn needless additional cost to the taxpayers of this state. We have the tools to right a wrong and prevent placing this relator into "appellate orbit." Simply put, under the facts of this case an appeal does not provide an adequate remedy even if it results in a reversal and new trial.

One of the rights we enjoy as citizens in a democratic society is the privilege of seeking the advice of counsel. In *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed.

---

1. Marta Rosas testified that Hanson told her that McLarty and the others would not leave. This is contrary to Anderson's testimony that Hanson was not in any type of protective custody at the time of the interview; that no one coerced or intimidated Hanson during the interview; that Hanson agreed to tape record the interview; and there was nothing secretive about the tape recording. Anderson further testified that during the interview Hanson was relaxed. Anderson's testimony obviously contradicts Rosas's statement of what Hanson told her.

2. In *Anaya v. People*, 764 P.2d 779 (Colo.1988), the Colorado Supreme Court held that a harmless error analysis was not applicable to the improper removal of appointed trial counsel.

158 (1932), the United States Supreme Court held the right to be heard carries with it the constitutional baggage of being heard by counsel. According to the Court, "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Id.*, at 69, 53 S.Ct. at 64. Implicit throughout the opinion is a recognition of the lofty position that the attorney-client relationship has enjoyed throughout history. The historically inviolate nature of the relationship that exists between a client and an attorney is no better represented than in society's commitment to protect confidential communications from disclosure, which predates the Elizabethen Age in England. 9 Wigmore on Evidence (3rd ed. 1940) § 2290. Its continuity is apparent in the adoption of Rule 503, Tex.R.Crim.Evid. Despite its perserverance as a protected and respected relationship maybe we in the profession, because we are exposed to it daily, are guilty of taking it for granted and thus fail to appreciate its value. In *Smith v. Superior Court of Los Angeles*, supra, Associate Justice Mosk commented that the attorney-client relationship "involves not just the casual assistance of a member of the bar, but an intimate process of consulation and planning which culminates in a state of trust and confidence between the client and his attorney." *Id.*, 68 Cal.Rptr. at 10, 440 P.2d at 74. McLarty and Lanehart had developed that "state of trust and confidence," *id.*, with their client. This is evidence by the relator's comment to Judge Clinton after he appointed new counsel: "There is no way this attorney or no other attorney can pick up where my attorney's left off."

We hold that the trial court erred in removing appointed counsel because under the circumstances of this case, Judge Clinton was without authority to do so. We assume that respondent will immediately perform his duty to withdraw such order. The writ of mandamus will issue only if he refuses to do so. It is so ordered.