IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NOS. AP-76,519 & 76,520






CHARLES KEVIN BOWEN


AND JENNIFER BOWEN, Relators


v.


HONORABLE BURT CARNES, 368TH JUDICIAL

DISTRICT COURT OF WILLIAMSON COUNTY, Respondent





ON PETITION FOR A WRIT OF MANDAMUS


IN CAUSE NOS. 09-649-K368 & 09-650-K368 IN THE


368TH DISTRICT COURT OF WILLIAMSON COUNTY





 Price, J., delivered the opinion of the Court in which Keller, P.J., and
Womack, Johnson, Keasler, Hervey, Cochran and Alcala, JJ., joined. Meyers,
J., not participating.


O P I N I O N



 We are called upon in this original mandamus proceeding to determine whether the
respondent, the trial court judge in the relators' pending capital murder prosecution, must
rescind an order granting the State's motion to disqualify the relators' mutually retained
counsel of choice, Robert Phillips. A principal witness in the State's case, a jailhouse
informant by the name of William Ballenger, was a former client of Phillips in an unrelated
criminal matter. The State moved to disqualify Phillips from representing the relators in their
capital trial on the grounds that Phillips might be hampered in his ability to effectively cross-examine his former client. Even though both the relators and Ballenger had executed waivers
of their rights to conflict-free counsel, the respondent nevertheless granted the State's motion
out of concern for "the integrity of the judicial process and the public's perception[.]" We
filed and set the relators' application in order to determine whether, under the particular
circumstances presented by this case, the respondent abused his discretion to deprive the
relators of their Sixth Amendment right to counsel of choice on the sole basis of his concern
with the public's perception of fairness. We will grant relief.

FACTS AND PROCEDURAL POSTURE

 The agreed facts are as follows. The relators, Kevin and Jennifer Bowen, were
charged by separate indictments with the capital murder of John Blattner, Jennifer's ex-husband, alleged to have occurred in March of 2009. They both retained Phillips to represent
them in these charges. (1) In February of 2010, Ballenger gave a statement to police in which
he detailed what he asserts Kevin told him with respect to this offense while both were
incarcerated in the Williamson County Jail. Ballenger had also retained Phillips to defend
him against unrelated charges of capital murder, murder, and aggravated assault. As of
February 18, 2010, when the State first revealed Ballenger's statement to Phillips, Ballenger
had already entered a negotiated guilty plea to murder, but his sentencing had not yet taken
place. In April of 2010, the State filed its motion to disqualify Phillips from representing the
relators. The State claimed, inter alia, that in the very likely event that the State should call
Ballenger to testify against the relators, Phillips would be put in the compromising position
of either having to vigorously attack Ballenger's credibility on cross-examination, in the
interest of the relators, or to refrain from doing so, which would be in Ballenger's best
interest but detrimental to the best interest of the relators.

 The respondent took up the State's motion to disqualify Phillips at a hearing on May
5, 2010. In the course of the hearing, Phillips introduced into the record signed written
waivers from both of the relators documenting their informed consent to their continued
representation by Phillips despite any conflict, as well as their waiver of any objection to his
continued representation of Ballenger. Phillips also requested permission to confer with the
respondent ex parte so that he might explain to the trial court, in a setting that would not
unduly reveal his trial strategy to the State, how he believed he could continue to represent
both the Bowens and Ballenger without an actual conflict of interest. The trial court declined
to permit such an ex parte conference, but allowed Phillips to submit a sealed affidavit, for
the respondent's perusal only, to thus explain himself. Phillips was briefly excused from the
hearing to execute such an affidavit, which the trial court then read to himself on the bench,
sealed, and admitted for record purposes. 

 As the May 5th hearing unfolded, the respondent made several remarks that seem to
indicate the bent of his thinking. Early on, the respondent announced:

 THE COURT: In the interest of time, my mind has not changed about
the potential or the real conflict between the Bowens and their ability to waive
[any conflict that might stem from Phillips's mutual representation of the two
of them] as long as it's done knowingly, intelligently, and voluntarily. I've
heard that and ruled on it.


 The reason we're here today having this hearing is because of the
disclosure from Mr. Ballenger. To me that is the issue. And it's not just
whether they all agree. It's how it would appear to the public at large. I mean
it's just kind of an incredible situation.


 MR. PHILLIPS: I understand, Judge.


 THE COURT: You, I think, said it. It's really about the integrity of the
judicial process and the public's perception of the judicial process and what
it would look like to go to a trial on a capital murder case where the same
attorney representing both defendants is also representing one of the
prosecution witnesses. That is what should be the focus of today's hearing.


Later, the respondent similarly observed:

 THE COURT: . . . What you said earlier-it's not even about these three
people and what they feel and what they think and even what they want at this
point. It's the integrity of the system as it appears to everybody else. And
what is it going to look like in a capital murder trial with codefendants having
you represent not just the two defendants but a witness that comes in who is
also a murder case who's testifying against your clients, and you're going to
have to cross-examine?


Assured by Phillips that his concerns about public perception would be obviated if he would
only hear Phillips out in an ex parte conference, the respondent answered:

 THE COURT: . . . [P]art of the problem is I'm looking down the road
beyond the trial to an appeal, assuming there is a guilty verdict, and then
ultimately a writ of habeas corpus. And I can imagine what some good appeal
lawyer will do given this situation. I can just see it in my mind. It would be
50 pages about how we ignored the law and truth and justice in Williamson
County once again. I'm frankly getting tired of hearing that.


Phillips insisted that "I can answer your question. I just can't do it in open court." He
continued:

 MR. PHILLIPS: . . . I can tell you why it will, I believe, if not satisfy
you at least respond to your question about why the Ballenger factor should not
disqualify me from either Bowen case or even Ballenger. But I can't do it here
without serving up my defense to the State in open court.


 THE COURT: It still doesn't answer my question -


 MR. PHILLIPS: It will.


 THE COURT: - about the appearance.


 MR. PHILLIPS: It will.


 THE COURT: It will not. It will not.


 I know how these things play out. I'm telling you I can see some
reporter that doesn't understand diddly about what's going on in the trial but,
you know, can pick up an issue like this and make a story out of it. But even
more important than that, because that doesn't really matter that much, it's
what happens in the appeals and in the writs down the road.


After reluctantly accepting Phillips's explanatory affidavit, the respondent reviewed it and
admitted it into evidence for record purposes. Nevertheless, the respondent persisted in his
view that "the appearance of impropriety" inherent in Phillips's continued representation of
both the relators and Ballenger was intolerable. He ruled:

 THE COURT: . . . [A]fter more than 20 years on the bench I've had this
issue brought before me in criminal cases, more often, frankly, in civil cases. 
And I've never granted one. I've always thought . . . that most times it was a
simple ethical issue and not a disqualification issue. And, as I've already
stated, I had already made this ruling once on the Bowens and any potential
conflict between them, and I had already determined that I thought they were
waiving any conflicts knowingly, intelligently, and voluntarily.


 The difference now is having a third party as a witness in the case
represented by the same counsel. And, you know, we talk a lot about the
appearance of impropriety. If there ever is one, this is it. I'm going to grant
the motion to disqualify as to both of the Bowens and deny it as to Mr.
Ballenger because . . . his deal is already cut, and I just don't see that as a real
issue in the Ballenger case.


Upon the suggestion that the respondent should disqualify Phillips in representing Ballenger
but permit him to continue representing the relators, the respondent replied:

 THE COURT: And to be frank, surely you . . . realize that I did think
of that as an alternative. I don't think it takes care of the issue as I see it. If
I'm wrong, I'm wrong, but I have thought of that and considered it.


Asked at this juncture whether he would consider allowing Phillips to continue to represent
at least one of the relators, the respondent answered:

 THE COURT: That doesn't address my issue at all. My issue isn't
between the Bowens. I've already addressed that issue. I was perfectly
comfortable and satisfied with my decision when it was just the Bowens and
the possible conflict. It's this other issue that is my concern.


With this final remark, the hearing came to a close.

 The relators filed an original application for writ of mandamus in the Third Court of
Appeals. (2) In a one sentence order, that court denied relief without elaboration (perhaps out
of deference to the confidential nature of Phillips's sealed affidavit). (3) We filed and set the
relators' subsequent original application for writ of mandamus to this Court and held oral
argument. At oral argument, we were informed that Ballenger has now been sentenced. 
Because his case is effectively concluded, Phillips no longer represents him. The case
presently before us therefore involves only the question of whether Ballenger's status as
Phillips's former client in an unrelated case justifies the respondent's order disqualifying
Phillips from further representation of the relators, given Ballenger's status as a potentially
important witness at the relators' pending capital murder trial.

MANDAMUS STANDARD

 We have described the standard that governs mandamus relief in criminal law matters
in State ex rel. Young v. Sixth Judicial District Court of Appeals: (4)

 The traditional test for determining whether mandamus relief is appropriate
requires the relator to establish two things. First, he must show that he has no
adequate remedy at law to redress his alleged harm. Second, he must show
that what he seeks to compel is a ministerial act, not involving a discretionary
or judicial decision. If the relator fails to satisfy either aspect of this two-part
test, then relief should be denied. As to the latter requirement, we have said
that it is satisfied if the relator can show he has a clear right to the relief
sought-that is to say, when the facts and circumstances dictate but one rational
decision under unequivocal, well-settled (i.e., from extant statutory,
constitutional, or case law sources), and clearly controlling legal principles. (5)


We will measure the relators' present claim against this standard. (6)

ANALYSIS

The Sixth Amendment Right to Counsel of Choice

 Wheat v. United States, (7) the parties agree, is the controlling authority on the Sixth
Amendment right to retained counsel of choice. In Wheat, the defendant requested the
substitution of newly retained counsel, one Iredale, just "two court days" before his trial was
set to commence. (8) Iredale also represented two other defendants, Gomez-Barajas and Bravo,
who were charged as participants in the same "far-flung drug distribution conspiracy" as
Wheat. (9) Gomez-Barajas had been previously acquitted of certain charges; to avoid others,
he had agreed to plead guilty to two other offenses, but the trial court had not yet accepted
his plea. (10) Bravo had pled guilty to a charge of drug transportation, and the Government
regarded him as a likely witness at Wheat's trial, "necessitating vigorous cross-examination
of Bravo by [Iredale]." (11) Moreover, if Gomez-Barajas's guilty plea were to fall through,
Wheat would likely be called to testify at any ensuing trial, which "would create an ethical
dilemma for Iredale from which one or the other of his clients would likely suffer." (12) The
Government objected to Iredale's proposed substitution as Wheat's counsel based on an
actual conflict of interest. (13) Wheat argued that, because he had obtained waivers of any
conflict from all three of Iredale's clients, to deny him Iredale's services would deprive him
of his Sixth Amendment right to retained counsel of his choice. (14) The Supreme Court
granted review to decide under what circumstances a trial court is permitted to reject a
defendant's waiver of his Sixth Amendment right to the effective assistance of counsel,
forcing him to go to trial with counsel who is guaranteed to be conflict-free in derogation of
his concomitant Sixth Amendment right to retained counsel of choice. (15)

 The Supreme Court began its analysis by recognizing that "the right to select and be
represented by one's preferred attorney is comprehended by the Sixth Amendment[.]" (16) On
the other hand, the Court emphasized, this right may be "circumscribed" by other Sixth
Amendment considerations whose "essential aim . . . is to guarantee an effective advocate
for each criminal defendant rather than to ensure that a defendant will inexorably be
represented by the lawyer whom he prefers." (17) Thus, the particular question presented in
Wheat was to what extent the Sixth Amendment right to retained counsel of choice may be
"qualified by the fact that the attorney has represented other defendants charged in the same
criminal conspiracy." (18)

 To Wheat's argument for a categorical rule that all other Sixth Amendment interests
should fall away in light of a waiver of the right to conflict-free counsel, the Supreme Court
responded:

 [N]o such flat rule can be deduced from the Sixth Amendment presumption in
favor of counsel of choice. Federal courts have an independent interest in
ensuring that criminal trials are conducted within the ethical standards of the
profession and that legal proceedings appear fair to all who observe them. *
* * Not only the interest of a criminal defendant but the institutional interest
in the rendition of just verdicts in criminal cases may be jeopardized by
unregulated multiple representation. (19)


For these reasons, the Supreme Court reasoned, when there is an actual conflict of interest,
"there can be no doubt that [a trial court] may decline a proffer of waiver, and insist that
defendants be separately represented." (20) Because in the context of a pretrial motion to
disqualify counsel of choice, the likelihood of an actual conflict of interest may be difficult
to assess, the Supreme Court went further, observing that:

 we think the district court must be allowed substantial latitude in refusing
waivers of conflicts of interest not only in those rare cases where an actual
conflict may be demonstrated before trial, but in the more common cases
where a potential for conflict exists which may or may not burgeon into an
actual conflict as the trial progresses. (21)


The Supreme Court ultimately held that the trial court in Wheat did not abuse its discretion
in rejecting the waiver of conflict-free counsel and denying the substitution of counsel,
concluding that trial courts in the pretrial context:

 must recognize a presumption in favor of [a defendant's] counsel of choice,
but that presumption may be overcome not only by a demonstration of actual
conflict but by a showing of a serious potential for conflict. The evaluation of
the facts and circumstances of each case under this standard must be left
primarily to the informed judgment of the trial court. (22)


In deference to Wheat's presumption in favor of counsel of choice, this Court has recognized
that:

 when a trial court unreasonably or arbitrarily interferes with the defendant's
right to choose counsel, its actions rise to the level of a constitutional violation. 
Therefore, courts must exercise caution in disqualifying defense attorneys,
especially if less serious means would adequately protect the government's
interests. (23)


For reasons we explain below, we hold that the respondent clearly erred to interfere with the
relators' Sixth Amendment right to retain counsel of their choosing.

Adequate Remedy at Law?

 In Stearnes v. Clinton, (24) a mandamus case involving the arbitrary disqualification of
appointed counsel rather than retained counsel of choice, this Court held that the regular
appellate process "does not provide an adequate remedy even if it results in a reversal and
new trial." (25) What was true in the context of arbitrarily removed appointed counsel pertains
a fortiori for the right to retained counsel of choice. In the former context, we observed:

 Having appointed counsel, a criminal defendant should not have to be
subjected to a trial and appeal process without the appointed counsel he had
grown to accept and gain confidence in. The utilization of the appellate
process in this situation to correct this particular ill would be too burdensome
and would only aggravate the harm and most likely would result in a new trial
compelling relator to again endure a trip through the system, creating in turn
needless additional cost to the taxpayers of this state. (26)


Likewise, relief in the form of a new trial does not adequately vindicate the Sixth
Amendment right at issue when retained counsel is unconstitutionally disqualified. After all,
the right to retained counsel of choice "commands, not that a trial be fair, but that a particular
guarantee of fairness be provided--to wit, that the accused be defended by the counsel he
believes to be best." (27) Requiring an accused to go through the ordeal of trial and appeal
before he can pursue his remedy on appeal is a waste of public resources that can serve only
to compel him unduly to reveal his evidence and trial strategy to the State. We do not
hesitate to conclude that the relators have satisfied the first prerequisite for mandamus relief.



Clear Right to Relief?

 The State, as real party in interest, (28) argues that the record reveals at least a serious
potential for conflict in that Phillips will be expected to cross-examine his former client,
Ballenger--a situation ordinarily rife with potential for divided loyalties and breach of
confidentiality. Phillips, argues the State, "would likely be influenced by privileged
information he has learned about Ballenger in the course of representing him." (29) "At the very
least," the State continues, "he would be forced to attack Ballenger's credibility as a
'jailhouse snitch[.]'" (30)

 Rule 1.06(b)(2) of the Texas Disciplinary Rules of Professional Conduct prohibits an
attorney (in this case, Phillips) from representing a client (the relators) if that representation
reasonably appears to be limited by the attorney's responsibilities to a third party
(Ballenger). (31) But under Rule 1.06(c), an attorney may represent the client if the attorney
reasonably believes the representation will not be materially affected by the adverse
limitation caused by his responsibility to the third person and the client consents after full
disclosure. (32) The relators have consented to representation by Phillips despite whatever
limitations his prior representation of Ballenger may impose, and there is no issue with
regard to the validity of their waivers of the right to conflict-free counsel. It is therefore not
surprising that, judging by the respondent's comments on the record, he was not primarily
concerned about Phillips's fealty toward the relators. He expressed far more solicitude for
Phillips's duties with respect to his former client, Ballenger.

 Those duties to a former client are set out in Rules 109 and 105 of the Texas
Disciplinary Rules of Professional Conduct. (33) Under Rule 109(a), an attorney may not,
without prior consent of a former client, represent a new client in a matter adverse to the
former client if representation of the new client will, in reasonable probability, involve a
violation Rule 1.05's prohibition against disclosure of confidential information obtained from
the former client, or if the matter in which he represents the new client is the same or
substantially related to the matter in which he represented the former client. It is clear that
Phillips did not represent Ballenger with respect to the same or a substantially related matter
as that in which he now represents the relators. Any continuing duty that Phillips owes
Ballenger by virtue of the prior representation, allegedly forming the basis for a worrisome
conflict of interest, can only stem from Rule 105's prohibition against the use of confidential
information to attack Ballenger's credibility as a witness for the State.

 On the facts presented here, however, the potential for such a conflict is not serious. 
During oral argument before this Court, counsel for the relators revealed that Ballenger "is
not regarded to us as a hostile witness." Without disclosing any of the substance or details
of Phillips's sealed affidavit, we simply observe that it generally lays out a defensive strategy
for representing the relators that is consistent with the relators' assertion during oral
argument. That the defense regards Ballenger as a friendly rather than a hostile witness
would seem to lessen the need for vigorous, adverse cross-examination of Ballenger. Such
a defensive strategy effectively eliminates any potential that Phillips's loyalty to Ballenger
as a former client would be compromised.

 We note, however, that Phillips's affidavit does not expressly address the question
whether his proposed defensive strategy would necessarily avoid any reliance on his part on
confidential information that he may have obtained from Ballenger during the course of that
now-completed representation. Moreover, while Ballenger has also executed a waiver of any
objection to Phillips's representation of both himself and the relators, his waiver likewise
fails to address the question of the possible disclosure of confidential information. 
Nevertheless, because the offense to which Ballenger pled guilty is entirely unrelated to the
charges against the relators (unlike the scenario in Wheat, in which all of Iredale's co-defendant-clients were charged with related crimes), the likelihood is exceedingly remote that
Phillips would face the dilemma of having to decide whether to reveal confidential
information stemming from his representation of Ballenger in order to adequately defend the
relators' interests. (34) Obviously Ballenger himself regards the likelihood as remote, since he
has waived any complaint to Phillips's continued representation of the relators. Under these
particular circumstances--Phillips's representation of Ballenger is complete, it involved an
offense that had nothing to do with the charges against the relators, and Ballenger himself
has waived any objection to Phillips's continued representation of the relators--we are
satisfied that the record reveals no actual or serious potential for conflict of interest inherent
in Phillips cross-examining his former client. (35)

 Indeed, the respondent has not found otherwise. It is apparent to us from the record
excerpts above that the respondent focused, not on the existence of an actual or serious
potential for conflict, but almost exclusively on whether the public might perceive there to
be such a conflict. The respondent persistently worried aloud about the appearance of
impropriety. Even after finally permitting the relators to make their ex parte case for the
absence of any true conflict, the respondent once again invoked public perception as
justification for the disqualification, never making any record finding that an actual conflict,
or even a serious potential for one, existed.

 This is not to suggest that the respondent's concerns about public perception of
fairness are trivial or irrelevant; indeed, as we have already noted, the Supreme Court in
Wheat observed during the course of its analysis that trial courts "have an independent
interest in ensuring . . . that legal proceedings appear fair to all who observe them." (36) But the
Supreme Court's ultimate holding was that "the presumption in favor of . . . counsel of
choice" is overcome only by "an actual conflict or a serious potential for conflict." (37) Clearly,
before the mere appearance of unfairness may be allowed to defeat the Sixth Amendment
presumption in favor of retained counsel, it must be accompanied at least by some serious
potential for conflict. Here, the respondent allowed his concern about the public's perception
of fairness, without more, to override the relators' own perception that the best way they
could assure fairness for themselves was to be "defended by the counsel [they] believe[d] to
be best." (38) Such a concern, untethered to a finding of an actual or serious potential for
conflict of interest, cannot suffice to overcome the Wheat presumption. Nor does it pay
sufficient heed to our admonition in Gonzalez v. State that "courts must exercise caution in
disqualifying defense attorneys, especially if less serious means would adequately protect the
government's interests." (39) We hold that disqualification of retained counsel under these
circumstances is an abuse of disecretion, and that mandamus relief will lie to remedy the
situation. (40)

CONCLUSION

 Accordingly, the relators are entitled to a writ of mandamus directing the respondent
to rescind his order disqualifying Phillips from representing them in their capital murder trial. 
However, as is customary, we will withhold issuance of the writ at this time to allow the
respondent the opportunity to conform his actions to this opinion. Only in the event that the
respondent should not rescind his order will the writ of mandamus issue.


DELIVERED: June 15, 2011

PUBLISH 
1. The State's motion to disqualify Phillips also sought to disqualify him from mutually
representing Kevin and Jennifer, but the respondent did not grant the motion on that basis, having
already declared in September of 2009 that he found Kevin's and Jennifer's waivers of the right to
conflict-free counsel valid and acceptable to him in this regard. Whether Phillips should be
permitted to represent both Kevin and Jennifer (without regard to his representation of Ballenger),
therefore, is not a question that is presently before us--only the question of whether he may be
prohibited from representing either relator on account of his prior representation of Ballenger.
2. See Padilla v. McDaniel, 122 S.W.3d 805, 808 (Tex. Crim. App. 2003) ("when a court of
appeals and this court have concurrent, original jurisdiction of a petition for a writ of mandamus
against the judge of a district or county court, the petition should be presented first to the court of
appeals unless there is a compelling reason not to do so.").
3. In re Bowen, 2010 WL 2977486, No. 03-10-00316-CV (Tex. App.--Austin, delivered July
28, 2010) (not designated for publication).
4. 236 S.W.3d 207 (Tex. Crim. App. 2007).
5. Id. at 210 (internal citations, footnotes, and quotation marks omitted).
6. The State, as the real party in interest in this matter, argues that it is the court of appeals's
denial of mandamus relief that we should be reviewing rather than the respondent's ruling directly,
citing State ex rel. Young v. Sixth Judicial District Court of Appeals, supra, at 210-11, for that
proposition. State's Supplemental Response, at 5-6. Because the court of appeals issued only a one-sentence order, we do not know on what basis it denied relief. In any event, in practice it makes little
difference whether we purport to review the court of appeals's mandamus ruling or the trial court's
order of disqualification. Either way, we review the appropriateness of the trial court's conduct. As
we pointed out in Young, "we determine whether the court of appeals abused its discretion
essentially by undertaking a 'de novo application of the two pronged test'" for mandamus relief. 236
S.W.3d at 210-11 (citing George E. Dix & Robert O. Dawson, 43B Texas Practice: Criminal
Practice and Procedure § 46.85 (2d ed. 2001), at 190).
7. 486 U.S. 153 (1988).
8. Id. at 155, 157.
9. Id. at 154-55.
10. Id.
11. Id. at 155, 164.
12. Id. at 164.
13. Id. at 155-56.
14. Id. at 156-57.
15. Id. at 158.
16. Id. at 159. Indeed, this facet of Sixth Amendment protection "commands, not that a trial be
fair, but that a particular guarantee of fairness be provided--to wit, that the accused be defended by
the counsel he believes to be the best." United States v. Gonzalez-Lopez, 548 U.S. 140, 146 (2006).
17. Wheat v. United States, supra, at 159. See also Gonzalez v. State, 117 S.W.3d 831, 837
(Tex. Crim. App. 2003) ("The right to assistance of counsel contemplates the defendant's right to
obtain assistance from counsel of the defendant's choosing. However, the defendant's right to
counsel of choice is not absolute.").
18. Wheat v. United States, supra, at 159.
19. Id. at 160.
20. Id. at 162.
21. Id. at 163.
22. Id. at 164.
23. Gonzalez v. State, supra, at 837. Cf. Stearnes v. Clinton, supra (trial court lacked authority
to remove appointed counsel "arbitrarily" and could be compelled by mandamus to rescind order
purporting to do so); Buntion v. Harmon, 827 S.W.2d 945, 949 (Tex. Crim. App. 1992) ("we cannot
agree that a trial judge's discretion to replace appointed trial counsel over the objection of both
counsel and the defendant extends to situations where the only justification for such replacement is
the trial judge's personal 'feelings' or 'preferences.'"); Stotts v. Wisser, 894 S.W.2d 366, 367 (Tex.
Crim. App. 1995) (same).
24. 780 S.W.2d 216 (Tex. Crim. App. 1989).
25. Id. at 225. See also Buntion v. Harmon, supra, at 948 (same); Stotts v. Wisser, supra, at 367
(same).
26. Stearnes v. Clinton, supra, at 225.
27. United States v. Gonzalez-Lopez, supra, at 146.
28. Prior to filing and setting this cause, on October 10, 2010, we ordered the respondent to file
a response within thirty days. In a letter to the Court dated February 8, 2011, the respondent
responded, as follows:


 My response is that I listened carefully to both sides, studied the law that was
presented by the attorneys and, after due consideration, made my decision. I believe
my decision was correct but, of course, I will abide by the decision of the Court of
Criminal Appeals.


Otherwise, the respondent simply adopted the response of the State as the real party in interest.
29. State's Supplemental Response, at 10.
30. Id.
31. See Tex. Disciplinary Rules Prof'l Conduct Rule 1.06(b)(2) ("a lawyer shall not
represent a person if the representation of that person . . . reasonably appears to be or become
adversely limited by the lawyer's . . . responsibilities to another client or to a third person"). Because
Ballenger is not currently Phillips's client, it cannot be said, strictly speaking, that Phillips could be
"adversely limited" in his representation of the relators by virtue of his responsibilities to Ballenger
as "another client" under this provision. 
32. See Tex. Disciplinary Rules Prof'l Conduct Rule 1.06(c) ("A lawyer may represent a
client in the circumstances described in (b) if . . . the lawyer reasonably believes the representation
of each client will not be materially affected; and . . . each affected or potentially affected client
consents to such representation after full disclosure of the existence, nature, implications, and
possible adverse consequences of the common representation and the advantages involved, if any.").
33. See Tex. Disciplinary Rules Prof'l Conduct Rules 1.09(a)(2) & (3) ("Without prior
consent, a lawyer who personally represented a client in a matter shall not thereafter represent
another person in a matter adverse to the former client . . . if the representations in reasonable
probability will involve a violation of Rule 1.05; or . . . if it is the same or a substantially related
matter."). See also id. Rule 1.05(b)(3) (generally providing that "a lawyer shall not knowingly . . .
[u]se confidential information of a former client to the disadvantage of the former client after the
representation is concluded unless the former client consents after consultation or the confidential
information has become generally known.").
34. See Wayne R. LeFave et al., 3 Criminal Procedure § 11.9(c) (3rd ed. 2007), at 900 n.115
& cases cited ("Disqualification may also be imposed where the prior representation of the witness
was in a matter unrelated to the current charges against the defendant, but only on a showing that
counsel's potential impeachment of the witness would have to be limited to avoid disclosure of
confidential information acquired in the prior representation.").
35. This view is consistent with that taken by other courts confronted with issues of attorney
disqualification arising from defense counsel's prior representation of a prosecution witness. See
People v. Frisco, 119 P.3d 1093, 1095 (Colo. 2005) (observing that "when the court's concern is
protecting the interests of former clients rather than protecting the defendant, . . . a defendant's
choice of counsel will not be lightly denied[,]" and holding that trial court abused its discretion to 
disqualify counsel on a record lacking substantial evidence that, in representing defendant, trial
counsel would have to reveal confidential information obtained from former client); Daniels v.
State, 17 P.3d 75, 84 (Alaska App. 2001) (observing that "a court should rarely disqualify an attorney
based on a former attorney-client relationship if the former client does not seek the attorney's
disqualification[,]" and holding that trial court abused its discretion to disqualify appointed counsel
where no confidential information likely to be revealed and "[n]o one whose interests are at stake"
asserted a conflict). See also State ex rel. Blake v. Hatcher, 218 W.Va. 407, 417, 624 S.E.2d 844,
854 (2005) (holding "that where the State moves for disqualification of a criminal defendant's
counsel of choice due to counsel's former representation of a State witness, the State bears a heavy
burden of proving disqualification is necessary and justified[,]" i.e., that an actual conflict or serious
potential for conflict exists, and remanding for hearing).
36. Wheat v. United States, supra, at 160.
37. Id. at 164.
38. United States v. Gonzalez-Lopez, supra, at 146.
39. Gonzalez v. State, supra, at 837.
40. Stearnes v. Clinton, supra, at 223; Buntion v. Harmon, supra, at 949; Stotts v. Wisser,
supra, at 367.