In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-07-00044-CV


______________________________





IN THE INTEREST OF A.S., A CHILD





 


On Appeal from the 123rd Judicial District Court


Panola County, Texas


Trial Court No. 2004-D-042




 




Before Morriss, C.J., Carter and Moseley, JJ.


Opinion by Justice Carter



O P I N I O N



 Archie Morris Samford (Morris) and Rebecca Samford are the parents of A.S. and were
divorced in January 2005. In July 2006, Morris filed a motion to modify the child custody order,
seeking to change the joint managing conservatorship to his sole managing conservatorship. Morris
sought the mental examinations of both Rebecca and A.S.; the trial court ordered the examinations,
but Rebecca refused to comply. The court struck Rebecca's answer and counter-petition as a
sanction for failure to comply and entered a default judgment for Morris, naming Morris sole
managing conservator and Rebecca possessory conservator. Rebecca appeals. 

 Rebecca raises two points of error: that the striking of the pleadings negated her right to trial
by jury and that the judgment should be vacated since it was obtained by Morris' abuse of process. (1) 
Morris raises one cross-point: that he is entitled to damages for Rebecca's frivolous appeal.

I. Abuse of Process

 In her second issue, Rebecca asserts that the judgment should be vacated as it was based on
Morris' abuse of process and "carries the 'Foul Odor' of a potential '1983 Civil Rights Violation.'" (2) 
Rebecca provides this Court with one authority in support of this point of error: a case outlining the
elements of an abuse of process cause of action. (3) Rebecca presents no authority or argument in
support of the use of Section 1983 or proof of abuse of process as a basis for reversing or vacating
the judgment modifying custody. Neither does Rebecca attempt to show, with appropriate citations
to the record, how Morris abused any process or how this issue was raised in the trial court. For an
issue to be properly before this Court, the issue must be supported by argument and authorities and
must contain appropriate citations to the record. See Tex. R. App. P. 38.1(h). An inadequately
briefed issue may be waived on appeal. See Fredonia State Bank v. Gen. Am. Life Ins. Co., 881
S.W.2d 279, 284 (Tex. 1994) (discussing "longstanding rule" that point may be waived due to
inadequate briefing). Accordingly, we will not consider this complaint. See id. 

II. Right to Jury After Sanctions

 In her first issue, Rebecca asserts that, despite the striking of her answer and counter-petition,
she was still entitled to have a jury determine whether Morris had proven the required elements in
his motion to modify the conservatorship and possession order. We review a denial of a jury request
for abuse of discretion. See Mercedes-Benz Credit Corp. v. Rhyne, 925 S.W.2d 664, 666 (Tex.
1996). The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts
present an appropriate case for the trial court's action; rather, it is a question of whether the court
acted without reference to any guiding rules or principles. Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238 (Tex. 1985). 

 A. The Sanctions

 Morris twice asked the trial court to compel Rebecca's mental examination and to impose
sanctions for Rebecca's failure to submit herself to examination as ordered. The court twice again
ordered the examination, imposed sanctions of attorney's fees, and warned Rebecca that further
noncompliance could result in the striking of her pleadings and entry of an adverse "ruling . . . in this
cause." Morris filed a third motion to compel and for sanctions for Rebecca's failure to sign the
releases necessary for the ordered examination of A.S. 

 Rebecca's reasons for not complying were (1) discomfort with the particular examiner;
(2) reluctance to discuss with the examiner the facts underlying a related criminal matter; and
(3) reluctance to have her son discuss that same matter. (4) At a hearing in open court on Morris' third
motion to compel and for sanctions and after allowing Rebecca to consult privately with her attorney,
the court presented Rebecca with the release form and explained to her that, if she failed to sign it,
the sanction would be that "she just flat loses no chance of getting whatever story she wants to
present in front of the Court -- in front of a jury." Rebecca refused to sign the form. 

 The trial court granted the motion to strike the pleadings and stated: "given that set of
circumstances, there is no jury issue to be resolved." The signed order on the motion specified that
the court struck the answer and counter-petition and found Rebecca in default. The order in the suit
to modify contained only the following findings of fact: "Due to Respondent's willful and bad faith
refusal to comply with four orders of this Court, a sanctions order was entered striking Respondent's
answer and counterclaim. The Court therefore finds that the material allegations in the petition to
modify are true and that the requested modification is in the best interest of the child." 

 B. Default Modification of Possession or Conservatorship Order

 Several guiding rules and principles govern the disposition of this matter. First, we note that
a custody modification, as a determination of issues of conservatorship, possession, or access to a
child, requires that the "best interest of the child shall always be the primary consideration of the
court." Tex. Fam. Code Ann. § 153.002 (Vernon 2002). "[I]t cannot be said that the best interest
of the child has been served when a court reaches its conclusion based on traditional rules of
pleading and practice rather than on a comprehensive review of the available evidence." Williams
v. Williams, 150 S.W.3d 436, 447 (Tex. App.--Austin 2004, pet. denied) (requiring evidence to be
taken in parental rights termination default); see also In re Macalik, 13 S.W.3d 43, 45 (Tex.
App.--Texarkana 1999, no pet.) (finding, in assessing the fair notice of a particular modification,
that "in cases affecting the parent/child relationship, when the best interest of the child is always the
overriding consideration, technical rules of pleading and practice are of little importance"). 

 The Texas Supreme Court, in the context of reviewing the sufficiency of the pleadings in
support of a modification judgment, has noted that, once the child is brought under the court's
jurisdiction by suit and pleading cast in terms of custody and control, "it becomes the duty of the
court in the exercise of its equitable powers to make proper disposition of all matters comprehended
thereby in a manner supported by the evidence." Leithold v. Plass, 413 S.W.2d 698, 701 (Tex. 1967)
(analyzing predecessor statute). Indeed, in another case examining the sufficiency of the evidence
of whether a modification was in the best interests of the children, the Texas Supreme Court stated: 
"Suits affecting the parent-child relationship are intensely fact driven, which is why courts have
developed best-interest tests that consider and balance numerous factors." Lenz v. Lenz, 79 S.W.3d
10, 19 (Tex. 2002). 

 The focus on the best interest of the child, in the context of a default judgment, leads us to
a second guiding rule and principle: while "the parent's failure to respond may affect the trial court's
consideration of the issues in the case, . . . it should not form the sole basis for the trial court's
judgment." Williams, 150 S.W.3d at 448. In other words, the effect of default in a custody
modification, like in other family law matters, is different from other defaults in that "allegations in
the motion to modify may not be taken as confessed for want of an answer." Considine v. Considine,
726 S.W.2d 253, 254 (Tex. App.--Austin 1987, no pet.); cf. Tex. Fam. Code Ann. § 6.701 (Vernon
2006) (no default in divorce). Even on respondent's default, "the movant must prove up the required
allegations of the motion to modify." (5) Considine, 726 S.W.2d at 254; see also Giron v. Gonzalez,
No. 08-05-405-CV, 2007 WL 2810054, at *4-5 (Tex. App.--El Paso Sept. 27, 2007, no pet. h.)
(citing Agraz v. Carnley, 143 S.W.3d 547, 552 (Tex. App.--Dallas 2004, no pet.) ("in an appeal
from a default judgment modifying an order establishing conservatorship or possession and access,
the movant must prove up the required allegations to modify the existing suit affecting and
establishing the parent-child relationship")). One court has stated that, in a petition to modify, "until
the moving party has discharged the onerous burden imposed upon him by the statute . . . the trial
court must deny the motion to change the custody. This is termed a 'threshold inquiry.'" Armstrong
v. Armstrong, 601 S.W.2d 724, 725-26 (Tex. App.--Beaumont 1980, writ ref'd n.r.e.) (footnote
omitted) (interpreting predecessor modification statute in evidentiary challenge to default judgment). 

 On the entry of the default judgment below, the court did not conduct a hearing (6) and
expressly found Morris' allegations true on the basis of his pleadings. But Rebecca does not
complain that the court entered judgment on Morris' pleadings. Neither does she complain of the
sufficiency of the evidence, if any, before the court in support of the findings. Rather, she complains
that, even after striking her answer and counter-petition, she was entitled to a jury trial on the issues
Morris was required to prove. Having determined that some fact-finding is required, we must now
determine if a jury, as opposed to the court, is the proper body to find those facts. Thus, we come
to the next guiding rule and principle: the constitutional and statutory right to a jury trial. "The
right of trial by jury shall remain inviolate." Tex. Const. art. I, § 15. The statute provides:

 (a) . . . a party may demand a jury trial.


 . . . .


 (c) In a jury trial:


 (1) a party is entitled to a verdict by the jury and the court may not
contravene a jury verdict on the issues of:


 (A) the appointment of a sole managing conservator. 


Tex. Fam. Code Ann. § 105.002(a), (c) (Vernon Supp. 2007). The right to a binding jury verdict
on the statutorily enumerated issues includes such a verdict on a petition to modify. See Lenz, 79
S.W.3d at 19-20; Taft v. Johnson, 553 S.W.2d 408, 410 (Tex. Civ. App.--El Paso 1977, writ ref'd
n.r.e.). 

 In this instance, the trial court specifically struck the answer and counter-petition of Rebecca. 
However, she had properly filed a jury demand and the trial court did not attempt to strike the jury
demand. We are unaware of any cases that have addressed whether the jury demand survives "death
penalty" sanctions (7) in a child custody modification action. Rebecca refers, by analogy, to a case in
which the jury demand survived death penalty sanctions in a divorce action. See Marr v. Marr, 905
S.W.2d 331, 333-34 (Tex. App.--Waco 1995, no writ) (but also applying Tex. R. Civ. P. 243--right
to jury trial for unliquidated damages after default--to questions of divorce property division). We
are persuaded by the concurring opinion in that case, by Chief Justice Thomas, that a "defaulting"
defendant (by virtue of death penalty sanctions) in a family law matter is still entitled to rely on her
jury demand and have a jury trial on any fact question related to the custody modification when the
jury demand is not struck. See Marr, 905 S.W.2d at 335 (Thomas, C.J., concurring).

 We do not question the trial court's striking of the answer and counter-petition as a sanction
for Rebecca's direct refusal to obey a legitimate order of the court. However, after those pleadings
were struck, her demand for a jury trial was still viable. Since a default judgment cannot be taken
in family law modification cases, it was necessary for the fact-finder to hear evidence and conclude
(1) a material and substantial change of circumstances had occurred since the last order, and (2) a
change of conservatorship was in the best interest of the child. Since the jury demand was still
outstanding, Rebecca was entitled to have a jury determine the factual issues that Morris was
required to prove. In this instance, it appears that neither a judge nor jury made this factual decision,
but it was considered found by default since Rebecca's answer and counter-petition were struck. In
this regard, the court erred and abused its discretion. 

 Having determined that the court abused its discretion in denying Rebecca's right to a jury
trial, we next must determine whether the court's error was harmful. Rhyne, 925 S.W.2d at 667. The
wrongful denial of a jury trial is harmful, and requires reversal, "when the case contains material fact
questions." Id. As discussed above, the statute requires findings of fact that modification is in the
best interest of the child and that the circumstances of the child or one or both of the conservator
parents has materially and substantially changed. See Tex. Fam. Code Ann. § 156.101. The denial
of a jury verdict on these material fact questions requires reversal.

III. Frivolous Appeal 

 In his cross-point, Morris asks this Court to impose sanctions on Rebecca for filing a
frivolous appeal. See Tex. R. App. P. 45. Having found merit in Rebecca's argument on appeal, we
deny the counterpoint. See In re Estate of Davis, 216 S.W.3d 537, 548 (Tex. App.--Texarkana
2007, pet. denied).

 Accordingly, the judgment is reversed and the case is remanded to the trial court for further
proceedings. 



 Jack Carter

 Justice


Date Submitted: September 7, 2007

Date Decided: December 4, 2007

1. Rebecca does not challenge the propriety of the sanctions themselves.
2. See 42 U.S.C.A. § 1983 (2003).
3. J.C. Penney Co. v. Gilford, 422 S.W.2d 25 (Tex. App.--Houston [1st Dist.] 1967, writ ref'd
n.r.e.).
4. Morris initiated the suit to modify after Rebecca returned A.S. between twelve and twenty-four hours after he thought the child should have been returned at the end of Rebecca's summer
possession. Morris also pursued felony charges against Rebecca for interference with child custody;
Rebecca was indicted for that crime. The criminal matter was ongoing during the pendency of the
modification action. The court had granted Rebecca limited immunity from her compelled
evaluation and prohibited the use of the results of the evaluation by any party in any other
proceeding. 
5. The required allegations for the modification of conservatorship are that (1) modification
would be in the best interest of the child, and (2) the circumstances of the child, a conservator, or
other affected party have materially and substantially changed. See Tex. Fam. Code Ann. § 156.101
(Vernon Supp. 2007). The party seeking the modification bears the burden of proving that there has
been a material and substantial change in circumstances within the relevant time frame and that the
modification is in the child's best interest. Gardner v. Gardner, 229 S.W.3d 747, 755-56 (Tex.
App.--San Antonio 2007, no pet.). 
6. The trial court had conducted several hearings on temporary orders before default, including
one in which the court heard the testimony of multiple witnesses before entering a temporary order
modifying the terms of possession of the child. The court did not take notice of any of the earlier
hearings or testimony in entering its judgment. 
7. That is, dismissal of a case for discovery abuse. See TransAmerican Natural Gas Corp. v.
Powell, 811 S.W.2d 913, 920 (Tex. 1991) (Gonzalez, J., concurring).


n-bottom:.0001pt;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 tab-stops:center 3.25in right 6.5in;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoAcetate, li.MsoAcetate, div.MsoAcetate
 {mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-link:"Balloon Text Char";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:none;
 mso-layout-grid-align:none;
 text-autospace:none;
 font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-bidi-font-family:Tahoma;}
p.MsoNoSpacing, li.MsoNoSpacing, div.MsoNoSpacing
 {mso-style-name:"No Spacing\,Quotation";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoNoSpacingCxSpFirst, li.MsoNoSpacingCxSpFirst, div.MsoNoSpacingCxSpFirst
 {mso-style-name:"No Spacing\,QuotationCxSpFirst";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoNoSpacingCxSpMiddle, li.MsoNoSpacingCxSpMiddle, div.MsoNoSpacingCxSpMiddle
 {mso-style-name:"No Spacing\,QuotationCxSpMiddle";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
p.MsoNoSpacingCxSpLast, li.MsoNoSpacingCxSpLast, div.MsoNoSpacingCxSpLast
 {mso-style-name:"No Spacing\,QuotationCxSpLast";
 mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 mso-style-type:export-only;
 margin-top:0in;
 margin-right:.5in;
 margin-bottom:0in;
 margin-left:.5in;
 margin-bottom:.0001pt;
 mso-add-space:auto;
 text-align:justify;
 text-justify:inter-ideograph;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
.MsoPapDefault
 {mso-style-type:export-only;
 margin-bottom:10.0pt;
 line-height:115%;}
 /* Page Definitions */
 @page
 {mso-page-border-surround-header:no;
 mso-page-border-surround-footer:no;
 mso-footnote-separator:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") fs;
 mso-footnote-continuation-separator:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") fcs;
 mso-endnote-separator:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") es;
 mso-endnote-continuation-separator:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") ecs;}
@page Section1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:1.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") eh1;
 mso-header:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") ef1;
 mso-footer:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") f1;
 mso-first-header:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.Section1
 {page:Section1;}
@page Section2
 {size:8.5in 11.0in;
 margin:2.0in 1.0in 1.0in 1.0in;
 mso-header-margin:2.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") eh1;
 mso-header:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") ef1;
 mso-footer:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") f2;
 mso-first-header:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-10-012-CR%20Trotman%20v.%20State%20Opinion%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.Section2
 {page:Section2;}
-->











 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00012-CR

                                                ______________________________

 

 

                             JOHN WILLIAM TROTMAN, III,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                       On Appeal from the 196th
Judicial District Court

                                                              Hunt County, Texas

                                                            Trial
Court No. 24916

 

                                                           
                                       

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                        Memorandum Opinion by Chief Justice Morriss








                                                      MEMORANDUM OPINION

 

            Without
warning, John William Trotman, III, burst through the front door of Ryan
Rhodens home on the evening of November 12, 2007, where Ryans sister,
Glenisha Rhoden, stood.  Trotman was
wearing a mask and carrying a butcher knife. 
He scuffled with Glenisha, demanding money and threatening her with the
knife.  On hearing the commotion, Ryan
emerged from the hallway carrying a baseball bat.  The three struggled and ended up in the
bedroom, where they fell in a heap. 
While Ryan was on the floor, Trotman stabbed him in the heart,
inflicting a fatal wound.  Trotman fled
the scene of the crime, but was arrested a short time later.  A jury convicted Trotman of capital murder
and sentenced him to life in prison. 
Trotman appeals his conviction, alleging four points of error.

            We affirm
the judgment of the trial court because (1) the trial court did not err in
dismissing second chair counsel when the death penalty claim was abandoned, (2)
the evidence is legally and factually sufficient to prove capital murder, (3)
the trial court did not err in failing to instruct the jury on self-defense,
and (4) the failure to request a jury instruction on the lesser-included
offense of murder did not render Trotmans trial counsel ineffective. 

(1)       The Trial Court Did Not Err in Dismissing
Second Chair Counsel When the Death             Penalty
Claim Was Abandoned

 

            After the
State announced its intention to seek the death penalty against Trotman, the
trial court appointed Scott A. Cornuaud as second-chair counsel for Trotman, in
accordance with Article 26.052 of the Texas Code of Criminal Procedure.[1]  Tex.
Code Crim. Proc. Ann. art. 26.052 (Vernon Supp. 2009).  A few weeks before trial, the State announced
in open court that it no longer intended to seek the death penalty against
Trotman.  Jury selection was scheduled to
begin September 28, 2009, with trial to commence October 5, 2009.  At the time of the States announcement,
Cornuaud had been working on the case for ten months.  The trial court removed Cornuaud as counsel
for Trotman over lead counsels objection.[2]

            On
appeal, Trotman contends the trial court erred in rescinding Cornuauds
appointment.  We disagree.[3]

            The right to
any attorney is a fundamental right.  Gideon v. Wainwright, 372 U.S. 335
(1963).  If a defendant cannot afford an
attorney, counsel shall be appointed by the court to represent the
defendant.  Id. at 344.  Moreover, once
the attorney-client relationship has been established, the trial court does not
have plenary power to remove court-appointed counsel without sufficient cause.  Stearnes
v. Clinton, 780 S.W.2d 216, 22122 (Tex. Crim. App. 1989) (en banc).  Indeed, once a valid appointment has been
made, the trial court cannot arbitrarily remove an attorney as counsel of
record over objection.  Id. at 223.

            Trotman
contends that the rescission of Cornuauds appointment, merely because the
State abandoned its plan to seek the death penalty, was not warranted and did
not amount to good cause.  Trotman cites
Article 26.04(j)(2) of the Texas Code of Criminal Procedure, which provides:

An attorney appointed under this article shall:

 

[R]epresent the defendant until charges are
dismissed, the defendant is acquitted, appeals are exhausted, or the attorney
is relieved of his duties by the court or replaced by other counsel after
finding of good cause is entered on the record.

 

Tex. Code Crim. Proc. Ann. art.
26.04(j)(2) (Vernon Supp. 2009).

 

            In
further support of this contention, Trotman relies on Stearnes.   In that case, Stearnes was appointed only one
attorney, whose appointment was rescinded by the trial court after the attorney
attempted to vigorously represent his clientby interviewing the primary
witness for the State.  On petition for
writ of mandamus, the trial court was ordered to rescind its order removing
Stearnes counsel from the case, as it did not have the inherent power to
validly remove appointed counsel.  Stearnes, 780 S.W.2d at 223.  Unlike Stearnes,
the trial courts decision in this case was based on the elimination of the
grounds for appointment of Cornuaudthe States intention to seek the death
penalty in the circumstance Trotman was found guilty.

            Trotman also
relies on Stotts in support of his
contention that the trial court erred in rescinding Cornuauds
appointment.  The Stotts case is likewise distinguished from the facts presented
here.  In Stotts, the defendants only attorney was removed on an arbitrary
basis without good cause; the removal was tantamount to leaving the defendant
without an attorney.  In fact, Stotts holds that, absent a principled
reason apparent from the record, a trial judge does not have discretion to
replace appointed trial counsel over objection of both counsel and the
defendant.  Stotts, 894 S.W.2d at 368. 
In this case, Trotman continued to be represented by Wilkerson, an
attorney who had been assigned to his case for more than a year and who was
qualified to sit as first chair in a death penalty case.[4]

            This is not
a situation in which the trial court rescinded Cornuauds appointment based on
nonexistent inherent authority. 
Article 26.04(j)(2) of the Texas Code of Criminal Procedure explicitly
contemplates the removal of appointed counsel after a finding of good cause is
entered on the record.  Tex. Code Crim. Proc. Ann. art.
26.04(j)(2).  The core issue, then, is
whether the States decision to abandon the death penalty constitutes good
cause for Cornuauds removal. Said another way, we must determine whether the
abandonment of the death penalty constitutes a principled reason in support
of the trial courts decision.  We hold
that it does.

            Article
26.052(e) requires that:

 

The presiding judge of the district court in
which a capital felony case is filed shall appoint two attorneys, at least one
of whom must be qualified under this chapter, to represent an indigent
defendant as soon as practicable after charges are filed, unless the state gives notice in writing that the state will not seek
the death penalty.

 

Tex. Code Crim. Proc.
Ann. art. 26.052(e) (Vernon Supp. 2009) (emphasis added).

 

            Clearly,
Trotman was entitled to two appointed attorneys at the inception of his case,
one of whom was statutorily required to be qualified in death penalty
cases.  The right to the appointment of
two attorneys exists, however, only in those capital felony cases in which the State
is seeking the death penalty. 
Furthermore, Article 26.052(a) provides, in part, that this article
establishes procedures in death penalty cases for appointment and payment of
counsel to represent indigent defendants at trial . . . .  Tex.
Code Crim. Proc. Ann. art. 26.052(a) (Vernon Supp. 2009).   

            The
trial court expressed concern regarding authority to continue the appointment
of two attorneys for Trotman, along with the payment of those attorneys, when
it became apparent the State was no longer seeking the death penalty.  This is a legitimate concern, given the
statutory language quoted above which rather clearly states that only where the
death penalty is being sought does an indigent defendant have the right to the
appointment of two attorneys to represent him or her at state expense.   Accordingly, we determine that abandonment
of the death penalty constitutes a principled reason in support of the trial
courts decision to rescind Cornuauds appointment.  In the interests of justice, we further note
that, if any error did exist in the trial courts determination to rescind
Cornuauds appointment, any such error has not been shown to have been
harmful.  See Brown v. State, 182
S.W.3d 427, 430 (Tex. App.Texarkana 2005, no pet.) (where there is no total
deprivation of the right to counsel, error is not structural and is subject to
harmless-error analysis).  We overrule this
point of error.

(2)       The Evidence Is Legally
and Factually Sufficient to Prove Capital Murder

 

            We review the legal and factual
sufficiency of the evidence supporting a conviction under well-established
standards.  In conducting a legal
sufficiency review, we consider the evidence in the light most favorable to the
verdict to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Laster v. State, 275 S.W.3d 512, 517
(Tex. Crim. App. 2009).  We must give
deference to the responsibility of the trier of fact to fairly resolve conflicts
in testimony, to weigh the evidence, and to draw reasonable inferences from
basic facts to ultimate facts.  Hooper
v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing Jackson v.
Virginia, 443 U.S. 307, 31819 (1979)). 
We are not required to determine whether we believe that the evidence at
trial established guilt beyond a reasonable doubt; rather, when faced with
conflicting evidence, we must presume that the trier of fact resolved any such
conflict in favor of the prosecution, and we must defer to that
resolution.  State v. Turro, 867
S.W.2d 43, 47 (Tex. Crim. App. 1993).  In
conducting a factual sufficiency review, we consider the evidence in a neutral
light.  Watson v. State, 204
S.W.3d 404, 41415 (Tex. Crim. App. 2006). 

            We may find evidence factually
insufficient if (1) the evidence supporting the conviction is too weak to
support the fact-finders verdict, or (2) considering conflicting evidence, the
fact-finders verdict is against the great weight and preponderance of the
evidence.  Laster, 275 S.W.3d at
518.  In so doing, we may find the
evidence insufficient when necessary to prevent manifest injustice.  Id. 
Although we give less deference to the verdict in a factual sufficiency
review, we will not override the verdict simply because we disagree with
it.  Id.  Both legal and factual sufficiency are
measured by the elements of the offense as defined by a hypothetically- correct
jury charge.  Malik v. State, 953
S.W.2d 234, 240 (Tex. Crim. App. 1997); see also Grotti v. State, 273
S.W.3d 273, 280 (Tex. Crim. App. 2008).

            Under a hypothetically-correct
charge, the jury was required to find, beyond a reasonable doubt, that (1)
Trotman (2) on or about the 12th day of November, 2007, (3) intentionally and
knowingly (4) caused Ryans death (5) by cutting and/or stabbing him with a
knife, and (5) Ryans murder was committed intentionally in the course of
committing or attempting to commit a robbery. 
Trotman takes issue only with respect to the final elementthat Ryans
murder was committed intentionally in the course of committing or attempting to
commit a robbery.  

            Section 19.03(a)(2) of the Texas
Penal Code provides that a person commits capital murder if the person commits
murder and the person intentionally commits the murder in the course of
committing or attempting to commit . . . robbery . . . .  Tex.
Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2009).  Section 29.02(a) of the Texas Penal Code
states that a person commits robbery if the person, in the course of committing
a theft, (1) intentionally, knowingly or recklessly causes bodily injury to
another; or (2) intentionally or knowingly threatens or places another in fear
of imminent bodily injury or death.  Tex. Penal Code Ann. § 29.02(a) (Vernon
2003).  Trotman maintains that, because
the primary evidence for the allegation of robbery is Glenishas testimony, and
her testimony is filled with errors and contradictions, the evidence is legally
and factually insufficient to support the verdict.

            Glenisha testified that, while she
stood in the doorway of her brothers home on the evening of his murder, she
and Ryanwho was in another room of the housewere talking to each other.  Glenisha did not see anyone on the porch when
she came into Ryans house, and she never heard Trotman behind her.  Trotman caught Glenisha off guard, came at
her from behind with a knife in his hand, and told her to give me the . . .
money.  When Glenisha replied that she
had no money, Trotman again demanded that she give him money.  Again, Glenisha indicated that she had no
money.  Trotman demanded money yet a
third time, and told Glenisha to put the money in his bag.   Glenisha replied that she was unemployed and
that she could not give him something she did not have.  She could see a knife in Trotmans hand as he
was standing behind her so closely that he was touching her.  Trotman was holding a bag and demanded give
me the  . . . money and put it in the
bag.  

            Glenisha struggled with Trotman,
attempting to pull away the do-rag scarf that covered his lower face.  During the struggle, Glenisha broke her nails
down to the quick.  Upon hearing the
commotion, Ryan came to Glenishas defense with a baseball bat, and the three
struggled and ended up fighting in the hallway and in the bedroom, where the
stabbing occurred.  Trotman fled the
scene, and Glenisha was able to find a telephone to contact police.  

            To dispute the robbery allegation, Trotman
points out the errors and contradictions of Glenishas testimony.  While Glenisha testified that she struggled
with Trotman and broke her fingernails scratching his face, the DNA report
revealed that Glenishas fingernail scrapings excluded Trotman as the source of
the DNA.[5]  Trotman also points out that Glenisha
testified that he held the knife in his left hand, but she did not see anything
in his right hand.  In contradiction to
this, Glenisha later testified that Trotman carried a bag during the
robbery.  While Glenisha claims she was
injured by the knife Trotman wielded, DNA analysis failed to confirm this
claim.[6]  No property or cash was alleged to have been
taken from Glenisha or Ryan.

            Finally,
Trotman argues that, while Glenisha testified that Trotman was behind her in
the hallway pushing her forward during the attack, she also testified that Ryan
tripped and fell over a cord in the bedroom and Trotman fell on top of
him.  Having also tripped, Glenisha fell
on Trotman.  Trotman maintains that this
scenario is only possible if Trotman was in front of Glenisha, rather than
behind her.  We point out, however, that
Glenishas testimony, read in context, reveals that the struggle between her
and Trotman was moving in the direction of the hallway, and Ryan met them
coming out of the bathroom.  Ryan then
grabbed a bat, and the three struggled in the hallway.  The written record contains the oral
description of the struggle and does not supply the precision one might get
from a video recording.  There is simply
no way to know the precise details of how the struggle took place and who was
behind whom at any given point during that struggle. 

            The State
contends the evidence is sufficient to establish beyond a reasonable doubt that
Trotman intentionally murdered Ryan in the course of committing or attempting
to commit a robbery.  Judging from the
condition of the house after the murder, it was obvious there had been a
struggle.  Pictures had been knocked off
the wall, and the floor was littered with broken glass.   

            Glenisha
testified that Trotman attempted to commit robbery as he came through the door
of Ryans house with a knife in one hand and a bag in the other yelling, give
me the . . . money and put it in the bag. 
She was frightened because Trotman held the knife close to her body
while demanding money.  The knife with
which Trotman threatened Glenisha was the same knife used to murder Ryan.  

            The State
also relies on the testimony of Latisha Jones in support of its contention that
the evidence is sufficient to prove beyond a reasonable doubt that Trotman
intentionally murdered Ryan in the course of committing or attempting to commit
a robbery.  Jones lives in Greenville and
met Trotman only a few months before the murder.  Trotman was living in Dallas, and Jones would
drive to Dallas and pick him up on weekends to stay with Jones at her home in Greenville.  

            Jones knew
Ryanhe was a distant relative.  She also
considered Ryan to be a friend.  Jones
saw Ryan on the Friday and Saturday before the murder when she went to his home
to purchase marihuana.  Trotman
accompanied her on both occasions, but did not go inside Ryans house.  As far as Jones knew, Trotman and Ryan did
not know one another.  

            On the
evening of the murder, Jones planned to go to her aunts house to get something
for her headache; Trotman accompanied her. 
When they arrived at the home of Jones aunt, Trotman stayed in the
car.  When Jones returned to the car,
Trotman was gone.  After visiting with
her aunt a bit longer, Jones and her aunt walked outside, where they spotted
Trotman running from around the corner. 
Trotman got in the passenger side of the car while telling Jones to
Drive, Tish.  Drive.  He was winded and told Jones not to return
home via the same route (which would take them past Ryans house).  When Jones asked Trotman what was going on,
he told her, I tried to get that nigger. 
It was time to eat.  Jones
stopped the car and asked Trotman what he tried to do and he said it was time
to eatshe thought he meant he tried to rob somebody.  Trotman told Jones that he poked Ryan with a
knife he had taken from her kitchen and that, since he told her what happened,
he was going to have to kill her and her children.  Jones fully believed he was capable of doing
that.  The police came to Jones house
twice that night to investigate Trotmans role in the murder and arrested
Trotman that same night. 

            Trotman
claims that the foregoing evidence is both legally and factually insufficient
to prove the element of robbery to support the charge of capital murder.  We disagree.  When considering this evidence in the light
most favorable to the verdict, we conclude that a rational trier of fact could
have found the essential elements of the crimein particular, the element of
robberybeyond a reasonable doubt.  See Laster, 275 S.W.3d at 517.  Further, and upon objective review of the
record, we cannot conclude that the evidence supporting the verdict is so weak
as to be clearly wrong or manifestly unjust. 
We do not find the verdict to be against the great weight and
preponderance of the conflicting evidence. 
We therefore conclude that the evidence is legally and factually
sufficient to support the verdict of guilt. 
Trotmans legal and factual insufficiency points of error are overruled.

(3)       The Trial Court Did Not Err in Failing to
Instruct the Jury on Self-Defense 

 

            A defendant
is entitled to an instruction on self-defense if the issue is raised by the
evidence, whether that evidence is strong or weak, unimpeached or contradicted,
and regardless of what the trial court may think about the credibility of the
defense.  Ferrel v. State, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001); Guilbeau v. State, 193 S.W.3d 156, 159
(Tex. App.Houston [1st Dist.] 2006, pet. refd).  Before a defendant is entitled to a
self-defense instruction, however, there must be some evidence, when viewed in
the light most favorable to the defendant, that will support the claim.  Ferrel,
55 S.W.3d at 591; Hill v. State, 99
S.W.3d 248, 250 (Tex. App.Fort Worth 2003, pet. refd).  Thus, entitlement to a self-defense
instruction is predicated on the provision of some evidence that the defendant
was authorized to use force against another. 
[A] defense is supported (or raised) by the evidence if there is some
evidence, from any source, on each element of the defense that, if believed by
the jury, would support a rational inference that that element is true.  Shaw v.
State, 243 S.W.3d 647, 65758 (Tex. Crim. App. 2007).  A defendant need not testify in order to
raise a defense.  Boget v. State, 40 S.W.3d 624, 626 (Tex. App.San Antonio 2001), affd, 74 S.W.3d 23, 26 (Tex. Crim. App.
2002).  Defensive issues may be raised by
the testimony of any witness, even those called by the State.  Jackson
v. State, 110 S.W.3d 626, 631 (Tex. App.Houston [14th Dist.] 2003, pet.
refd).  When reviewing a trial courts
decision to deny a requested defensive instruction, we view the evidence in
the light most favorable to the defendants requested submission.  Bufkin
v. State, 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).   However, if the evidence, viewed in the
light most favorable to the defendant, does not establish self-defense, the
defendant is not entitled to an instruction on the issue.  Ferrel,
55 S.W.3d at 591.  

            Trotman argues
that the trial court should have included an instruction on self-defense in the
charge, in light of the evidence raised on that issue.  He directs our attention to the following
evidence:  (1) two knives found at the
Rhoden house, only one being the weapon used on Ryan; (2) Jones testimony that,
when Trotman returned to her car that evening, he was bleeding and told Jones
that someone hit him in the head with a baseball bat and that he poked that
person with a knife; (3) Jones testimony that Trotman had cuts and injuries to
his hands that were not there earlier that day; (4) testimony of Dr. Reade
Quinton, the Dallas County medical examiner, that Ryan suffered injuries to his
lower legs and the bottom of his foot, which injuries could have been caused by
stepping or stomping on the knife; and (5) Quintons testimony that Ryans
fatal chest wound was not inconsistent with the theory that it could have been
delivered by someone on the floor (at a lower angle) than Ryan.  When the foregoing evidence is analyzed in
light of the requirement that some evidence must be raised on each element of
the defense, we conclude the trial court was correct in its decision that an
instruction on self-defense was not warranted. 
Section 9.31 of the Texas Penal Code provides, in part, that a person
is justified in using force against another when and to the degree the actor
reasonably believes the force is immediately necessary to protect the actor
against the others use or attempted use of unlawful force.  Tex.
Penal Code Ann. § 9.31(a) (Vernon Supp. 2009).  Moreover, Section 9.32 of the Texas Penal
Code provides:

(a)        A
person is justified in using deadly force against another:

 

            (1) 
if the actor would be justified in using force against the other under    Section 9.31; and 

 

(2)  when and to
the degree the actor reasonably believes the deadly force    is immediately necessary:

 

                        (A) to protect the actor
against the others use or attempted use of               unlawful deadly force; or

 

                        (B) to prevent the
others imminent commission of aggravated        kidnapping,
murder, sexual assault, aggravated sexual assault, robbery, or          aggravated robbery.

 

Tex. Penal Code Ann.
§ 9.32(a) (Vernon Supp. 2009).

 

            The record
is devoid of evidence that Trotman reasonably believed the use of force was
immediately necessary to protect himself from the use or attempted use of unlawful deadly force, or to prevent the
commission of any of the offenses listed in Section 9.32 of the Texas Penal
Code.  Instead, the facts here indicate
that Trotman burst into Ryans home, wielding a butcher knife and demanding
money.[7]  The evidence does indicate that Ryan hit, or
attempted to hit, Trotman with a baseball bat. 
The evidence also reveals that Ryan seized the bat in order to defend
himself and his sister from Trotmans violent, and ultimately deadly,
attack.  Under these circumstances,
Trotman was not entitled to an instruction on self-defense.  This point of error is overruled.

 (4)      The
Failure to Request a Jury Instruction on the Lesser-Included Offense of Murder
Did    Not Render Trotmans Trial Counsel
Ineffective

 

            Trotman
also contends that his trial counsel provided deficient assistance because he
failed to request an instruction on the lesser-included offense of murder.  Trotman further contends that his counsels deficient
performance probably caused the jury to return a verdict of capital murder
rather than murder.  Trotman raised this
ineffective assistance claim on direct appeal, arguing that trial counsel
should have requested a lesser-included offense charge as it would apply to the
offense of murder.  

            The standard
of testing claims of ineffective assistance of counsel is set out in Strickland v. Washington, 466 U.S. 668
(1984).  To prevail on this claim, an
appellant must prove by a preponderance of the evidence (1) that his or her
counsels representation fell below an objective standard of reasonableness and
(2) that the deficient performance prejudiced the defense.  Id.
at 689; Rosales v. State, 4 S.W.3d
228, 231 (Tex. Crim. App. 1999).  To meet
this burden, an appellant must prove that the attorneys representation fell
below the standard of prevailing professional norms and that there is a
reasonable probability that, but for the attorneys deficiency, the result of
the trial would have been different.  Ex parte Martinez, 195 S.W.3d 713, 730
(Tex. Crim. App. 2006); Tong v. State,
25 S.W.3d 707, 712 (Tex. Crim. App. 2000). 
Under this standard, a claimant must prove that counsels representation
so undermined the proper functioning of the adversarial process that the trial
cannot be relied on as having produced a just result.  Strickland,
466 U.S. at 686.  

            To establish
his claim that trial counsels performance was deficient for failing to request
an instruction, Trotman must first show that he was entitled to an instruction
on the lesser-included offense of murder.  See
Kinnamon v. State, 791 S.W.2d 84, 97 (Tex. Crim. App. 1990) (since evidence
did not authorize submission of murder instruction as lesser-included offense
appellants trial counsel was not ineffective for failing to request it), overruled on other grounds by Cook v. State, 884 S.W.2d 485 (Tex.
Crim. App. 1994) (en banc).  To establish
he was entitled to an instruction on murder, Trotman must establish that murder
is a lesser-included offense of capital murder and that there was evidence that,
if guilty of an offense, Trotman was guilty only of murder.  See
Rousseau v. State, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993).

            Because
murder is a lesser-included offense of capital murder, the relevant inquiry is
whether there is some evidence that Trotman is guilty of only the lesser
offense.  See Havard v. State, 800 S.W.2d 195, 216 (Tex. Crim. App.
1990); Aguilar v. State,
682 S.W.2d 556 (Tex. Crim. App. 1985).  In
the factual setting of the instant case, the relevant inquiry is whether there
is conflicting evidence concerning whether Trotman killed Ryan in the course of
committing or attempting to commit a robbery.  See Tex.
Penal Code Ann. § 19.03(a)(2) (defining capital murder as murder
committed in course of robbery or attempted robbery).  We have previously discussed the evidence in
support of Trotmans capital murder conviction, i.e., that Trotman killed Ryan
while in the course of committing or attempting to commit a robbery.  We now consider whether there is any evidence
that Trotman merely killed Ryan and did not rob or attempt to rob him.  

            Trotman
contends that his entire defense was premised on the concept that he did not go
to Ryans home to rob him; rather, he went there to purchase drugs, and the
transaction, for whatever reason, went bad. 
Rather than claiming the existence of evidence that contradicts the
robbery or attempted robbery allegation, Trotman merely claims the evidence of
the aggravating circumstance of robbery was so weak that the jury could not
have found that element of capital murder beyond a reasonable doubt.[8]  Glenisha testified that Trotman burst into
the house with a knife drawn, threatening her and demanding money.  Trotman also admitted to Jones that he went
to Ryans house to commit a robbery.   In
addition, the jury heard testimony regarding Trotmans plan for the robbery.[9]
 Nothing in the record contradicts this
evidence.  Although Trotman calls into
question the strength of this evidence, a challenge to the strength of such
evidence does not lower the threshold of conflicting evidence required to
receive a lesser-included-offense instruction. 
Because there is no record evidence to contradict the evidence of attempted
robbery, Trotman was not entitled to a jury instruction on the lesser-included
offense of murder.  Cf. Robertson v. State, 871 S.W.2d 701 (Tex. Crim. App. 1993)
(affirming capital murder conviction after examining sufficiency of evidence
that defendant killed in course of robbing or attempting to rob victim).

            Because the
evidence did not authorize the submission of a murder instruction as a lesser-included
offense, Trotmans trial counsel was not ineffective for failing to request it.  However, even if the record before us
contained evidence to contradict the evidence of attempted robbery, we would
nevertheless be compelled to draw the same conclusion.   Indeed,
the presumption that trial counsels performance was reasonably based in sound
trial strategy, coupled with the absence of any supporting evidence in the
record of unreasonableness, compels a reviewing court to consider ways in which
trial counsels actions were within the bounds of professional norms.   Mata v. State, 226 S.W.3d 425, 431
(Tex. Crim. App. 2007).  Any number of
possibilities can be imagined here.  For
example, trial counsels trial strategy was to convince the jury that this was
a drug deal gone awry.  Because this
theory required Trotman to be present at the scene during the crime, it is
conceivable that trial counsel did not request an instruction on murder because
the testimony and physical evidence, including DNA testing, showed that Trotman
killed Ryan.

            Ineffectiveness
of counsel is a matter that must be firmly founded in the record, and the
record must affirmatively demonstrate the alleged ineffectiveness.  Smith v. State, 51 S.W.3d 806, 812
(Tex. App.Texarkana 2001, no pet.).  In
the absence of such a record, and in the lack of anything that would indicate such
completely ineffective assistance as could be shown without such a record, we
overrule the point of error.[10]

            We affirm
the judgment of the trial court.

 

 

 

 

                                                                                    Josh
R. Morriss, III

                                                                                    Chief
Justice

 

Date Submitted:          June
28, 2010  

Date Decided:             July 7, 2010

 

Do Not Publish











[1]The
order appointing Cornuaud provides, in part:

 

The Court, after having
reviewed the pleadings on file and hearing the evidence and arguments of
counsel is of the opinion and so finds that the Defendant is entitled to second
chair attorney to represent him against the charge of Capital Murder, as
alleged by the State.  The Court finds
that Scott A. Cornuaud has been approved for second chair trial counsel
pursuant to the List Of Attorneys Qualified For Appointment To Death Penalty
Cases In The First Administrative Judicial Region-Revised November 2008, a copy
of pertinent parts which is attached to this order.

 





[2]This
discussion occurred between the trial court and Toby Wilkerson, lead counsel
for Trotman: 

 

[Wilkerson]:  And Judge, Im asking Mr. Cornuaud be allowed
to stay on the case because hes helped all along and he knows things.

 

[Court]:  Okay. 
But I cannot pay somebody legally, I dont think.  I can pay him for all hes done to this
point.  I appoint for death penalty only.

 

[Wilkerson]:  Judge, for the record the State has two
attorneys and I think because its capital and not just a regular case  

 

[Court]:  Its not death.

 

[Wilkerson]:  I understand that.  But just for the record, Judge, Im asking
that Mr. Cornuaud be allowed to remain on the case.  

 

[Court]:  Deny.

 

 





[3]The
State argues that this point of error was not preserved for our review, urging
that no objection to Cornuauds removal was asserted by Trotman or Wilkerson at
the time of jury selection or at the time of trial and that the trial courts
decision was not challenged by writ of mandamus.  See
Buntion v. Harmon, 827 S.W.2d 945, 946 (Tex. Crim. App. 1992) (orig.
proceeding) (writ of mandamus to prevent attorneys removal from case is
normal vehicle for seeking relief); see
also Stotts v. Wisser, 894 S.W.2d 366, 367 (Tex. Crim. App. 1995).  On the record before us, we decline to find a
waiver of this point of error.





[4]Even
though this was no longer a death penalty case, Wilkersons name appears on the
list of attorneys qualified for appointment to death penalty cases in the first
administrative judicial region. 
Attorneys so qualified are selected by a local selection committee
pursuant to Article 26.052 of the Texas Code of Criminal Procedure.  Tex.
Code Crim. Proc. Ann. art. 26.052.

 





[5]The
DNA report excludes Trotman as a contributor to the right-hand fingernail
clippings from Glenisha.  The report does
not indicate fingernail clippings were taken from Glenishas left hand.  

 





[6]Two
knives were found at the scene; one was located on the floor at the entrance to
the bedroom and the second was located on the floor near the aquarium in the
living room area.  Only one knife was
subjected to DNA testing.  This knife was
the murder weapon; DNA testing showed that this knife contained Ryans
blood.  





[7]The
use of force is not presumed to be reasonable when the actor was otherwise
engaged in criminal activity (other than a class C misdemeanor) at the time the
force was used.  Tex. Penal Code Ann. § 9.31(a)(3) (Vernon Supp. 2009).





[8]We
have previously determined that the evidence here is legally and factually
sufficient to support the capital murder conviction.

 





[9]This
evidence included the fact that Trotman insisted on riding with Jones to her
aunts house November 12, 2007.  While
Jones was inside her aunts house, Trotman left without telling her where he
was going.  Jones saw Trotman arrive back
at the car running from around the corner, coming from the direction of
Rhodens house.  Trotman took the knives,
bag, and mask with him to commit the intended robbery.  He later admitted to Jones that he hid the
knife he had taken from her kitchen up the sleeve of his bulky coat so she
would not see it on her way to her aunts house.  The mask worn by Trotman to cover his face
was later recovered from Jones house, along with the clothing Trotman wore
during the crime.  Jones also identified
the bag with Rhodens blood on it recovered from the crime scene as Trotmans
bag that he brought from Dallas.  Trotman
returned to the car and ordered Jones to drive away.  He also instructed Jones to call her aunt and
tell her that Jones did not know the man who hopped into her car at her aunts
house.  Trotman indicated that, because
Jones knew what happened, he would have to kill her and her children.  





[10]Under
normal circumstances, the record on direct appeal will not be sufficient to
show that counsels representation was so deficient and so lacking in tactical
or strategic decision-making as to overcome the presumption that counsels
conduct was reasonable and professional. 
Mallett v. State,
65 S.W.3d 59, 63 (Tex. Crim. App. 2001).