

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-17-00342-CR

MATTHEW PAUL BENDER                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

----------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 1445409D

----------

## MEMORANDUM OPINION[1]

----------

## I. Introduction

On February 11, 2016, a man wearing "SWAT gear" and a ski mask shot the branch manager of a title loan store in the leg with a BB gun-type rifle and took cash and checks before escaping in a white Toyota Camry with a paper

---

[1]*See* Tex. R. App. P. 47.4.

license plate. The police stopped Appellant Matthew Paul Bender, who was driving a vehicle that matched the above description, near the scene.

When the police stopped his vehicle, Bender was wearing a black vest emblazoned with "SWAT," and police found in his vehicle a BB gun-type rifle, a loaded semiautomatic pistol, cash, multiple checks bearing the name "Texas Car Title & Payday Loan Services, Inc.," most of which were blank and contained in a package, and a blue binder containing a list of locations of check-cashing/short-term-loan businesses. The binder, which Bender testified that he had created "[w]ell before February 11," also contained pages stating the following:

- "I've implanted a deadly virus in you. It will kill you in less than 60 days. I have the antidote. If you follow my instructions, I'll mail the antidote to you at the address on your driver's license. If you'd like to have it mailed somewhere else, write the address on the bottom of this sheet of paper. I'll include with it your driver's license so you don't need to replace it."

- "Do NOT look at me or you'll be shot in the face."

- "Bring me all the cash in this office."

- "When you come back to work, release and mail every title currently held by this office, with the release portion signed by you, to ALL of the borrowers/clients whom have placed their title under fraud with your company. Sign here if you understand."

- "Take off your pants and give them to me."

- "You have harmed the public that you and your company claim to serve. You have financially raped your neighbors. Your price will be embarrassment, the pain you're experiencing now and loss of employment if you comply with my instructions. If you fail to comply, you will not get the antidote and you'll rot to death. If you report any of this encounter to your employer OR THE POLICE, you'll not get the antidote. Sign if you understand."

2

Bender was arrested and then indicted for aggravated robbery, a first-degree felony offense.  *See* Tex. Penal Code Ann. §§ 29.02(a)(2) (stating that a person commits the offense of robbery if, in the course of committing theft, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death), 29.03(a)(2) (West 2011) (stating that a person commits the offense of aggravated robbery if he commits robbery and uses or exhibits a deadly weapon).  He opted to represent himself at trial, and during his testimony, he admitted to having committed the offense.

A jury found Bender guilty and assessed his punishment at ten years' confinement and a $10,000 fine but recommended that his sentence (but not the fine) be suspended and that he be placed on community supervision.  *See id.* § 12.32 (West 2011) (stating that the punishment range for a first-degree felony is 5 to 99 years' confinement and up to a $10,000 fine).  The trial court entered judgment on the verdict, followed the jury's recommendation to suspend Bender's sentence (but not the fine), and placed him on community supervision for ten years.  Bender subsequently requested and received appointed appellate counsel.

Bender's stated issues on appeal are two-fold.  First, he argues that the trial court erred by denying his request for standby counsel.  Second, he complains of the trial court's order denying his motion to dismiss the case as violating his right to a speedy trial.  We affirm.

3

## II. Hybrid Representation

"It is well established that an accused has no absolute right to hybrid representation," and that while a trial court may permit hybrid representation, an accused has "no *right* to standby counsel." *Scarbrough v. State*, 777 S.W.2d 83, 92–93 (Tex. Crim. App. 1989); *see Fulbright v. State*, 41 S.W.3d 228, 235 (Tex. App.—Fort Worth 2001, pet. ref'd) (reiterating that an accused has no right to a lawyer to "work under [his] command" as standby counsel).

Referencing *Scarbrough*, Bender's counsel acknowledges that Texas law supports the trial court's decision to deny standby counsel, but he encourages us to consider that it was harmful to deny Bender standby counsel when he was "completely unable to present his defensive theories on his own." We are not at liberty to ignore precedent of the court of criminal appeals. *See State ex rel. Wilson v. Briggs*, 351 S.W.2d 892, 894 (Tex. Crim. App. 1961) ("The Court of Criminal Appeals is the court of last resort in this state in criminal matters. This being so, no other court of this state has authority to overrule or circumvent its decisions, or disobey its mandates.").

Furthermore, we disagree that Bender was "completely unable" to share with the jury his defensive theories. During his testimony, Bender stated that he went on a mission to expose payday loan companies for charging exorbitant fees and interest rates for short-term loans, "ruining families repeatedly in the D/FW Metroplex." He stated, "The prosecutor seemed to interpret this as being a robbery when it was not a robbery, it was a protest, and they knew that." Bender

4

claimed that his motivation was not money but rather freedom for people who were potentially victims of "loan shark stores." He said that he took the stack of checks from the title-loan company because he had forgotten to put his gloves on and "did not want to leave anything behind that might get [the] front door of [his] house kicked in, with a SWAT team coming in . . . so [he] needed to remove anything that [he] felt like [his] fingerprints were left on." He testified that he had intended to get caught and that even though he shot the store manager with the BB gun, "[i]n [his] mind, [he] was on a mission to free slaves." And although the jury found him guilty and assessed his punishment at ten years' confinement, the jury also recommended that he be placed on community supervision.

Further, nothing in this record indicates that Bender would have taken any advice from counsel even if the trial court had allowed hybrid representation. Bender was the recipient of three different appointed counsel before opting to represent himself pro se. His first appointed counsel was allowed to withdraw after Bender's wife retained counsel for him.[2] His second appointed counsel

---

[2]According to Bender's May 23, 2016 letter to the trial court, Bender agreed with his wife that his first appointed counsel was not "being a good representative of [his] interests," but stated, "Let's just say that the price was right" and noted that he might "now be able to communicate to [first appointed counsel] the importance of keeping [Bender's] wife updated during this legal process." The letter bears a notation that no action was taken on Bender's letter because new counsel was appointed.

5

withdrew, citing Bender's failure to cooperate as the reason she could not adequately represent him.[3]

In the interim between the withdrawal of his second appointed counsel and the appointment of his third attorney, Bender filed several pro se motions to dismiss the case,[4] and the trial judge originally assigned to Bender's case recused himself. After the case was reassigned to a new court, the trial court held a hearing to determine Bender's representation.

At the February 22, 2017 hearing, Bender stated that he did not want to represent himself but that he did not want the counsel that had been appointed for him.[5] The trial court informed him that if he retained an attorney, that attorney

---

[3]In December 2016, Bender supplied the court with a sample of the questions he had posed to his second appointed counsel, which included, "Why am I required to attend two 'summary' hearings within a one month time span? What is a summary hearing? If a summary hearing is a trial-preparation hearing, then who indicated to the prosecution that we desire a trial?" and "[W]ill I get the same treatment I have thus far, suggesting that I'm too ignorant to understand the false charges that I'm facing and the danger it creates for me?"

[4]During this time, Bender also filed a pro se "Writ of Quo Warranto," in which he demanded to know whether the court was a legitimate court or "a corporation of the corporation known as TARRANT COUNTY, INC. of the corporation STATE OF TEXAS, INC. of the corporation UNITED STATES, INC," and under what jurisdiction the court operated. He sought to bill the court for "$1,000 per minute spent inside the court room, whether waiting for the judge to call docket or after docket is called until such time as [Bender] is excused from his position as a witness or courtroom counselor during such appearance" and "$2,000 per minute spent inside any holding cell, jail, prison or in custody of any agent of the State of Texas or persons representing themselves to be in the employ of the government in any capacity."

[5]Bender informed the trial court that he and his third appointed counsel had spoken and that counsel "agree[d] that [Bender was] of sound mind and sober

6

could substitute in for his appointed counsel, but that he was not entitled to standby counsel. The trial court informed Bender that his third appointed counsel would remain his attorney until he could retain one. *See Stearnes v. Clinton*, 780 S.W.2d 216, 225 (Tex. Crim. App. 1989) (orig. proceeding) (noting that an indigent defendant has no right under the federal or state constitutions to have counsel of his choosing).

A month later, Bender filed a "Motion to Change Judge/Strike Order," in which he objected to having appointed counsel, complained that his right to defend himself was being violated, and stated that he was willing to accept appointed counsel only as standby counsel. Bender's third appointed counsel subsequently sought to withdraw, citing an inability to effectively communicate with his client, and the trial court allowed him to withdraw.

Bender asserted his right to represent himself. At the May 3, 2017 hearing, the trial court referenced the earlier hearing at which it had informed Bender that it would not be in his best interest to proceed pro se because of his lack of knowledge of the law and procedure. Bender replied, "I have a better understanding of it, and I would like to proceed acting as my own attorney." The trial court acquiesced and reset the trial date for June 5, 2017. After Bender

---

and drug free and all that fun stuff" and had agreed that Bender could proceed without him. Counsel clarified for the trial court that what he had told Bender was that the decision was up to the trial court after interviewing him, that counsel had no input on that decision, that it was entirely up to the trial court, and that it did not matter to him whether Bender represented himself or counsel did.

decided to proceed pro se, the trial court held hearings on May 26, 2017, June 5, 2017, July 14, 2017, September 29, 2017, and the morning of October 2, 2017.

Bender frequently complained that the trial court would not answer his questions, but the trial court repeatedly explained to him that it could not give him any legal advice[6] but recommended that he read the code of criminal procedure, the rules of evidence, the penal code, and the applicable case law. The trial court reminded Bender more than once that "[t]his is not law school. This is a court of law."[7] Instead of requesting new appointed counsel or renewing his request for standby counsel after the point that he opted to proceed pro se, Bender persevered in representing himself.

Bender's complaints, both at trial and on appeal, reflect his troubling and unrealistic sense of entitlement to rights, privileges, and procedures that the law and society simply do not afford him. At the outset, in the trial court, Bender revealed an expectation that he should be entitled to protest the predatory lending practices of payday loan companies but avoid prosecution for shooting

---

[6]The trial court explained, "I'm not here to advise you, because I'm not your attorney. I'm not [the State's] attorney. I'm not anybody's attorney. . . . I'm here to run the proceedings, to rule on motions, and make sure that everybody's rights are protected and laws are followed. So we don't have a question and answer with the judge."

[7]The trial court did provide some general explanations to keep the proceedings moving, such as during opening statements, when Bender asked, "Can I get a better explanation as to why I can't talk about the Lord in this court," the trial court responded, "Opening statement is a statement of the evidence." The trial court further elaborated that an opening statement was a summary of facts relevant to the case.

one of the company's employees in furtherance of such protest. One of Bender's pro se motions in the trial court showed that he expected—indeed demanded—financial compensation for his time in awaiting and attending court sessions. He also equated the resetting of trial dates as a "form of psychological warfare and terrorism." And after showing the trial court judge continuing disrespect, Bender complained repeatedly that she did not provide answers to all of his questions, implying that he was somehow entitled to have the judge act as his own personal legal advisor. Contrary to Bender's various and sundry accusations regarding the trial judge, however, the record here reveals such patience and forbearance in the face of recurring provocation that the trial judge should be commended for maintaining an even temperament throughout the process.

Although Bender's appellate counsel acknowledges that the law does not provide a right to hybrid representation, he complains that the trial court abused its discretion by denying hybrid representation to Bender. Because the record does not reflect that the trial court abused its discretion by denying standby counsel to Bender, we overrule his first issue.[8]

### III. Speedy Trial

In reviewing the trial court's ruling on an appellant's speedy trial claim, we apply a bifurcated standard of review: an abuse of discretion standard for the factual components, and a de novo standard for the legal components.

---

[8]Based on our disposition here, we need not address Bender's harm argument. *See* Tex. R. App. P. 47.1.

9

*Zamorano v. State*, 84 S.W.3d 643, 648 (Tex. Crim. App. 2002); *Murphy v. State*, 280 S.W.3d 445, 452 (Tex. App.—Fort Worth 2009, pet. ref'd).

In determining whether an accused has been denied his Sixth Amendment right to a speedy trial, we must use a balancing test in which the conduct of both the prosecution and the defendant are weighed. *Dragoo v. State*, 96 S.W.3d 308, 313 (Tex. Crim. App. 2003) (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972)). The factors to be weighed include, but are not limited to, the length of the delay, the State's reason for the delay, the defendant's assertion of his speedy trial right, and the prejudice to the defendant resulting from the delay. *Id.* No single factor is necessary or sufficient to establish a violation of the right to a speedy trial, *id.*, and the "'speedy-trial right is amorphous, slippery, and necessarily relative.'" *Hopper v. State*, 520 S.W.3d 915, 923–24 (Tex. Crim. App. 2017) (quoting *Vermont v. Brillon*, 556 U.S. 81, 89, 129 S. Ct. 1283, 1290 (2009)).

## A. Factors

While the State has the burden of justifying the length of delay, the defendant has the burden of proving the assertion of the right and showing prejudice. *See Barker*, 407 U.S. at 531–32, 92 S. Ct. at 2192–93. The defendant's burden of proof on the latter two factors varies inversely with the State's degree of culpability for the delay. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). Thus, the greater the State's bad faith or official negligence and the longer its actions delay a trial, the less a defendant must

10

show actual prejudice or prove diligence in asserting his right to a speedy trial. *Id.* at 280–81. Courts must apply the *Barker* balancing test with common sense and sensitivity to ensure that charges are dismissed only when the evidence shows that a defendant's actual and asserted interest in a speedy trial has been infringed. *Id.* at 281. The constitutional right is that of a speedy trial, not dismissal of the charges. *Id.* Review of the individual *Barker* factors necessarily involves fact determinations and legal conclusions, but the balancing test as a whole is a purely legal question. *Id.* at 282.

### 1. Length of the Delay

The length of the delay is measured from the time that the defendant is arrested or formally accused, and a speedy trial claim will not be heard until the passage of a period of time that is, on its face, unreasonable under the circumstances. *Dragoo*, 96 S.W.3d at 313–14. In general, the delay must approach a year to be unreasonable enough to trigger the inquiry. *Id.* at 314; *see also Hopper*, 520 S.W.3d at 924 (explaining that the length of delay is a double-inquiry: whether the delay is sufficiently long to trigger further analysis and to what extent it stretches beyond the triggering length).

Bender was arrested on February 11, 2016, and indicted on May 2, 2016, but his trial did not begin until October 2, 2017, approximately a year and a half later. Therefore, this factor weighs in favor of finding a violation of the speedy trial right. *Dragoo*, 96 S.W.3d at 314 (noting that the delay must stretch beyond the bare minimum needed to trigger judicial examination of the claim).

11

## 2. Reason for the Delay

When considering the reason for the delay, "'different weights should be assigned to different reasons,'" because some reasons are valid and serve to justify appropriate delay; in the absence of an assigned reason for the delay, a court may presume neither a deliberate attempt on the State's part to prejudice the defense nor a valid reason for the delay. *Id.* (quoting *Barker*, 407 U.S. at 531, 92 S. Ct. at 2192). The court must ask whether the State or the defendant is more to blame for the delay. *Hopper*, 520 S.W.3d at 924. Deliberate delay to hamper the defense is weighed heavily against the State while more neutral reasons, such as negligence or overcrowded courts, weigh against the State but less heavily. *Id.* A finding of bad faith in the speedy trial context requires a showing that the State was trying to gain a tactical advantage in the defendant's case. *Id.* at 928. Delay caused by the defense weighs against the defendant. *Id.* at 924.

The State filed a verified motion for continuance on May 31, 2017, a year and 29 days after the indictment was filed. In the motion, the prosecutor asserted that on May 26, 2017, the District Attorney's office became aware that there were several DNA samples recovered from the scene of the offense that had not been submitted to a laboratory for testing and that testing would take around a month. The trial court held a hearing on the motion on June 5, 2017. After Bender informed the trial court that he had no objection to the continuance, the trial court granted the continuance and then asked the prosecutor how long it

12

would take to process the DNA samples. When the prosecutor informed the trial court that it would take approximately a month, the trial court reset the trial for July 17, 2017.

On July 13, 2017, the prosecutor learned that the DNA testing had not been completed and filed a verified second motion for continuance the next day. The trial court held a hearing that day. At the hearing, the prosecutor explained that because the offense was a property crime, the lab had returned the DNA samples to the police department without testing. The prosecutor told the trial court that DNA swabs were taken from a vehicle steering wheel, the door of a building, a cash box, and Bender and asked the trial court to grant additional time to figure out which lab would complete the testing in a timely manner.

The trial court granted the motion without setting a new date for the trial. The DNA testing was completed August 28, 2017. The trial began 35 days later.

As set out above, the State had valid reasons for the delay, particularly when it could not control the actions of one of the labs. Accordingly, this factor weighs against finding a violation of the speedy trial right. *See Dragoo*, 96 S.W.3d at 314.

### 3. Defendant's Assertion of his Right

Although a defendant's failure to assert his speedy trial right does not amount to a waiver of that right, failure to assert the right makes it difficult for him to prove that he was denied a speedy trial because his lack of a timely demand indicates strongly that he did not really want a speedy trial and was accordingly

13

not prejudiced by the lack of one. *Id.* Further, a defendant's inaction weighs more heavily against a violation the longer the delay becomes. *Id.* And filing for a dismissal instead of a speedy trial generally weakens a speedy trial claim because it shows a desire to have no trial instead of a speedy one. *See Murphy*, 280 S.W.3d at 454. If a defendant fails to first seek a speedy trial before seeking dismissal of the charges, he should provide cogent reasons for this failure. *See id.*

The record reflects that most of the delays between Bender's May 2, 2016 indictment and the October 2, 2017 trial were caused by Bender himself. He went through three appointed attorneys before committing to self-representation, and he filed multiple pro se motions and other documents in the trial court and in this court during the pendency of the proceedings.

Bender acquiesced to the State's first motion for continuance, yet three days before the reset trial date, he filed a "Motion to Dismiss for Lack of a Speedy Trial" and a "Motion to Dismiss Due to Prosecutorial Misconduct." At the July 14, 2017 hearing on the State's second motion for continuance, Bender stated that he had been waiting to get notification of the DNA results before he reviewed *any* of the evidence against him because he wanted to make only one trip "and knock it out in one shot once all the evidence has been accumulated or compiled."

Between August 28, 2017, when the DNA test results became available, and October 2, 2017, when voir dire began, Bender filed three motions: a

14

"Motion to Dismiss for Lack of Evidence of Standing by Plaintiff & Prosecutor," a "Revised Motion to Dismiss due to Prosecutorial Misconduct," and a "Revised Motion to Dismiss for Lack of a Speedy Trial."

On September 29, 2017, the trial court heard Bender's various motions. During the hearing, Bender complained that he had not had sufficient time to review discovery. The trial court informed him that his trial was set for the following week because he had had access to most of the evidence since May and the letter notifying him of its supplementation had been sent to him in the middle of September. The trial court informed Bender that he would not be given additional time "without further showing that there's been some extraordinary evidentiary or discovery issue that's not covered and not been addressed" and overruled his speedy trial motion.

On October 2, 2017, the date the trial began, Bender filed additional motions, which the trial court heard that morning. After Bender complained that he had only found out the Friday before trial that discovery was complete and that he had "not yet had a chance to review the completed discovery," at the trial court's request, the prosecutor recounted what discovery was available and at what time: there were around 580 documents, most of which had been available to Bender since May 2017; since mid-September, the remaining documents—a registration return on Bender's vehicle, jail records, crime scene photos, a psychological report, crime scene notes, defense motions, a letter regarding additional discovery, and the DNA test results—had been available to Bender.

In light of this record, this factor weighs heavily against finding a violation of the speedy trial right.[9]

### 4. Prejudice to Defendant Resulting from the Delay

When assessing this factor, we must do so in light of the interests that the speedy trial right was designed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of the accused's anxiety and concern; and (3) limitation of the possibility that the accused's defense will be impaired. *Dragoo*, 96 S.W.3d at 315. The last item is the most serious because a defendant's inability to adequately prepare his case skews the fairness of the entire system; accordingly, affirmative proof of particularized prejudice is not essential to every speedy trial claim because excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify. *Id.* However, the "presumption of prejudice" is extenuated by the defendant's acquiescence in the delay. *Id.*

---

[9]Bender's counsel acknowledges the harm that Bender did to his speedy-trial argument by failing to file a motion requesting only a speedy trial and by agreeing to the State's request for a continuance, and he incorporates these facts into his standby counsel argument. But pro se litigants are held to the same standards as legal counsel with regard to the rules of evidence, procedure, and substantive law, and as stated above, we cannot ignore precedent of the court of criminal appeals. *See Williams v. State*, 549 S.W.2d 183, 187 (Tex. Crim. App. 1977); *Briggs*, 351 S.W.2d at 894; *see also Scarbrough*, 777 S.W.2d at 92 (observing that the choice to represent oneself must be knowingly and intelligently made but "need not be wise" and that an accused must be permitted to conduct his own defense, even if ultimately to his own detriment, if that is his informed decision).

The record reflects that Bender was out on bond during at least part of the case's pendency and had the ability, if not the desire, to make more than one trip to view the State's evidence. Bender complained in his July 14, 2017 motion to dismiss for lack of a speedy trial that he was being subjected to "a form of psychological warfare and terrorism" because "multiple trial dates [have] been scheduled and then reneged on by the State and/or the Court." But while Bender's frustration is apparent throughout his pro se motions, it appears to have been primarily rooted in his expectation of entitlement, combined with his inability to understand legal procedure or to follow the advice of counsel, and the trial court's understandable refusal to act as his personal law professor. Bender has failed to demonstrate any prejudice occasioned by the delay, and this factor weighs against finding a violation of his speedy trial right. *See id.*

## B. Analysis

As set out above, the weight of the four factors, when balanced together, is against finding a violation of the right to a speedy trial—the delay was not excessive in light of the circumstances here, the State had valid reasons for its motions for continuance, Bender's focus was on dismissal rather than a speedy trial, and he was prejudiced more by his own actions than by any action of the State. We overrule Bender's second issue.

17

## IV. Conclusion

Having overruled both of Bender's issues, we affirm the trial court's judgment.[10]

/s/ Bonnie Sudderth

BONNIE SUDDERTH
CHIEF JUSTICE

PANEL: SUDDERTH, C.J.; WALKER and PITTMAN, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: August 23, 2017

---

[10]Bender filed a "Motion to Appoint Attorney as Standby Counsel" in this court after his appointed appellate counsel filed a brief in this court. As set out above, Bender is not entitled to standby counsel. And in light of our disposition above, we deny his motion as moot.